**PANTHER PUMPS & EQUIPMENT COMPANY, INC., now Morrison Pump Co., Inc., Plaintiff,**

v.

**HYDROCRAFT, INC., Paul W. Schlosser and Edward Drath, Defendants.**

**No. 77–1142.**

United States Court of Appeals, Seventh Circuit.

Argued May 24, 1977.

Decided Nov. 1, 1977.

Rehearing and Rehearing In Banc Denied Dec. 15, 1977.

Roy E. Petherbridge, Edward D. Gilhooly, Chicago, Ill., for plaintiff.

James A. Baker, Timothy M. Bittel, Cleveland, Ohio, for defendants.

Before SWYGERT and CUMMINGS, Circuit Judges, and MARKEY, Chief Judge.[1]

MARKEY, Chief Judge.

Appeal under 28 U.S.C. § 1291 by Panther Pumps & Equipment Co., Inc. (Panther) from an order of the district court, 424 F.Supp. 815 (N.D.Ill.1976), which: (1) discharged an order to show cause why appellee Louis Beck (Beck) should not be held in civil contempt for violating a November 24, 1970 permanent injunction against patent infringement; (2) denied Panther's motion to add or substitute Beck and Universal Spray Systems, Inc. (Universal) as defendants; and (3) denied Panther's

motion to reopen the contempt hearing for additional testimony. We vacate the district court's order and remand the case with instructions.

*Background*

In February, 1967, Panther began what became a protracted patent case[2] by filing a complaint for infringement, seeking an accounting and an injunction against Hydrocraft, Inc. (Hydrocraft) and two officers of Hydrocraft, Paul W. Schlosser and Edwin H. Drath. Beck was not named as a defendant, but he, with Schlosser and Drath, had organized Hydrocraft in 1966. Beck was president and, like Schlosser and Drath, was a one-third owner of Hydrocraft's corporate stock.

In 1970, the case was tried before a jury, which found claim 23 of U. S. Patent 3,254,-845 ('845 patent) and claim 19 of U. S. Patent 3,367,270 ('270 patent), valid. The claims respectively define a paint spraying system and pump. Defendant Schlosser made both inventions while employed by Panther, to which he assigned both patents.

Finding Hydrocraft's manufacture and sale of its SPRAYMATE pump an infringement, the jury awarded $150,000 in damages against Hydrocraft and $5000 in damages against each of defendants Schlosser and Drath. Acting under Fed.R.Civ.P. 58, the clerk entered judgment on September 21, 1970. Defendants moved for withdrawal of judgment.

On October 8, 1970, while the motion for withdrawal was pending, Beck, Schlosser, Drath, and their attorneys met in Chicago to discuss the effect of the judgment and the forthcoming injunction. The attorneys advised that the injunction would preclude Hydrocraft's manufacture and sale of the SPRAYMATE domestically.

Schlosser and Drath testified in this contempt proceeding that, during the Chicago meeting, Beck announced a plan to keep Hydrocraft's assets out of the reach of Pan-

2. The district court docket entries fill twenty-one pages.

ther. Schlosser recalled that "Beck was going to take the assets and he was going to start the new corporation with them in Europe and start the company and pay off the bills, and that was it." Drath's post-meeting notes, summarizing the matters discussed, included:

> He [Beck] would set up Universal Spray Systems with a foreign base * * * and keep the Hydrocraft, Inc. assets out of reach of seizure.

On November 24, 1970, the district court denied the motion for withdrawal and entered final judgment and a permanent injunction against Hydrocraft, Schlosser, and Drath, and awarded damages as found by the jury. The court enjoined Hydrocraft, "its divisions, subsidiaries, *officers*, agents, servants, employees, successors, [and] assigns * * * directly or indirectly" (emphasis added) from further infringement. The injunction further stated:

> As used herein the term "infringing product" means any product covered by Claim 23 of the United States Letters Patent No. 3,254,845 and any product covered by Claim 19 of the United States Letters Patent No. 3,367,270, any colorable imitation or equivalent thereof, including, but not limited to, the product identified in the captioned case as Defendants' "SPRAY MATE PUMP" of Plaintiff's Exhibit 89.

Carrying out his plan to avoid seizure, Beck shipped eleven tons of SPRAYMATE parts, constituting substantially all the assets of Hydrocraft, to Cleveland.[3] The parts were consigned to "Becks Spray Systems, Inc.," a company under Beck's control, in three shipments on November 30, 1970, on December 2, 1970, and on January 5, 1971.

On December 18, 1970, defendants filed their notice of appeal to this court.

Pursuant to a discussion at the Chicago meeting, Beck paid Schlosser and Drath $100 each for their Hydrocraft stock on January 8, 1971, and became the sole shareholder of Hydrocraft on that date.

Also on January 8, 1971, Beck formed Universal as a new Ohio corporation with himself as the president and sole shareholder. The SPRAYMATE parts inventory of Hydrocraft was transferred from Becks Spray Systems, Inc. to Universal and shown as an asset on Universal's books. In March, 1971, using those SPRAYMATE parts, Universal began making and selling a slightly modified version of the SPRAYMATE pump, identified as the SPRAYMATE Model B (SPRAYMATE B).

On April 19, 1971, Hydrocraft (now wholly-owned by Beck) sought relief from judgment under Fed.R.Civ.P. 60(b), basing the motion on a newly-discovered German patent reference. The district court denied the motion on June 10, 1971.

On appeal, this court affirmed the judgment of validity, infringement, and the award of $150,000 in damages against Hydrocraft, but reversed the judgment for damages against Drath and Schlosser. *Panther Pumps & Equipment Co., Inc. v. Hydrocraft, Inc.*, 468 F.2d 225 (7th Cir. 1972). A petition for writ of certiorari was denied. 411 U.S. 965, 93 S.Ct. 2143, 36 L.Ed.2d 685 (1973).

In 1975, Panther's counsel learned from Schlosser and Drath of the transfer of assets and of the manufacture and sale by Universal of the SPRAYMATE B.[4] In October, 1975, Hydrocraft's charter was cancelled by the State of Ohio for failure to pay franchise taxes.

*The Contempt Proceeding Below*

On February 3, 1976, Panther moved for an order to show cause why Beck should not

---

**3.** Asked in this contempt proceeding whether he thought the Hydrocraft inventory belonged to Panther because of the judgment, Beck testified: "Yes, at the time I thought that they were going to come and get it."

**4.** Also in 1975, Panther (now Morrison) assigned the '845 and '270 patents to Wagner Spray Tech Corp., an assignment not material on this appeal because Panther retained "whatever rights it may have against Beck arising out of the prior Panther lawsuit * * *." (Exhibit DTX–27.)

be held in contempt for violating the injunction of November 24, 1970. The district court issued such an order and Beck moved to vacate. Ruling on March 31, 1976, the district court held that it had jurisdiction over Beck and that he was bound by the injunction, stating:

After examination of the affidavits and memoranda, I conclude that Beck is bound under the terms of the injunction as an officer and agent of Defendant Hydrocraft, Inc. The injunction further prohibits officers and agents from "assisting others either directly or indirectly" in infringing the patent[s]. It is therefore immaterial whether Beck personally or a corporation he controls is alleged to have violated the injunction.

Nonparties may be found in contempt of an injunction provided that they have actual notice of the injunction and aid or abet in its violations. [Citing authorities.] Once an injunction has issued, all that is necessary to bind those named is to notify them of the injunction. [Citing authorities.] Plaintiff's affidavits and the record as a whole establish that Beck had notice of the injunction.

In any case, it appears that Beck transacted business in Illinois within the meaning of Chapter 110, Section 17 of the Illinois Revised Statutes. He may therefore be made subject to this Court's jurisdiction pursuant to Rule 4(e) of the Federal Rules.

Prior to the contempt hearing, Panther moved under Fed.R.Civ.P. 25(c)[5] to substitute or add Beck and Universal as defendants in the original suit. At the hearing, the district court received evidence on the transfer of assets and ordered that the issue be briefed.

An understanding of the contempt issue is facilitated by a brief review of the patented subject matter. The patents are directed to an improved paint spraying system, particularly the pump, and to elimination of the detrimental heating of the pump during "standby" operation, i. e., when the painter turns off the spray nozzle without stopping the pump motor.

The pump structure itself includes a housing divided into two chambers by a flexible diaphragm. One chamber is connected to a paint supply and to a spray gun. As the diaphragm cycles back and forth in the chamber, paint is drawn into that chamber and expelled therefrom to the spray gun. To move the diaphragm, the other chamber contains a driving fluid (ethylene glycol) acted upon by a reciprocating, motor-driven piston. On the forestroke of the piston, pressure applied to the ethylene glycol by the piston pushes the diaphragm; on the backstroke, suction withdraws the diaphragm. A piston shaft extends from the housing for connection with a motor.

During standby operation, paint drawn into the paint chamber can no longer be expelled because the spray gun nozzle is closed. The paint chamber becomes filled with paint and prevents diaphragm movement. Because ethylene glycol is practically incompressible, something must give to permit the piston to continue moving. Prior art devices continuously recirculated either paint through the paint chamber or driving fluid through the driving fluid chamber. The motor worked as hard as in the painting operation, and the fluid became hot from recirculation, requiring auxiliary cooling equipment.

Schlosser discovered that reduced motor work and heat buildup could be achieved by a return of less driving fluid on the piston backstroke than that expelled on the forestroke. The need for auxiliary cooling equipment was eliminated. The patents theorize that on the piston backstroke, because the chamber expands to a volume greater than that of the driving fluid, "cavities" will be formed within the driving fluid, requiring less work from the motor

---

**5.** Rule 25. Substitution of Parties.

(c) Transfer of Interest. In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party. Service of the motion shall be made as provided in subdivision (a) of this rule.

during standby operation. It was also theorized that "some" of the driving fluid will change from liquid to vapor and that the cavities will therefore have vapor in them. On the next piston forestroke, the vapor will recondense as the chamber reduces in volume. The reduction in heating, as compared to prior art devices, is referred to in the patent specifications by the coined phrase, "cavitation cooling" and is described as occurring when the driving fluid "evaporates" to form the vapor and then recondenses to the liquid state.

Claim 23 incorporates claims 22 and 1 and defines the entire system:

1. A fluid power transfer apparatus including a housing defining chamber, a driving fluid in said chamber, said fluid having reversible vapor and liquid phases, and movable means for alternately applying and removing pressure forces to and from said fluid to cause reversal between said phases.

22. A fluid power transfer apparatus substantially as set forth in claim 1 including a variable load material in combination with said housing, and wherein said movable means is a prime mover for moving said variable load material, and said drive fluid is a liquid disposed between said prime mover and said variable load comprising relatively incompressible liquid means interposed between said prime mover and said variable load material and means responsive to variations of the variable load material being driven for controlling a conditions [sic] establishing driving and non-driving relationships of said prime mover and said variable load material, said non-driving relationship being characterized by cyclic vaporizing and condensing of said liquid whereby to limit horsepower consumption of said prime mover.

23. A fluid power transfer apparatus substantially as set forth in claim 22, said prime mover being a pump, and said variable load material being a paint spray gun.

Claim 19 incorporates claim 12 and defines the pump:

12. In a liquid driven diaphragm fluid pump of the character described wherein the diaphragm has limiting positions of movement in the pump housing, a reciprocating piston in said housing for driving a mass of liquid for driving said diaphragm, means for controlling the quantity of the liquid in said housing comprising, a source of driving liquid, liquid supply valve means in liquid communication between said source and the mass of liquid, means for biasing said supply valve means to closed position and being opened by relatively low liquid pressure, liquid vent valve means in liquid communication with the mass of liquid and liquid low pressure outlet for said vent valve means, said vent valve means being biased to closed position and being opened by pressure exerted by the driving liquid when said exerted pressure exceeds the pressure of the pumped fluid by a predetermined degree of pressure, and valve means on the pumped fluid side of the diaphragm for controlling the delivery of pumped fluid and including a closable pumped fluid port, said control valve means, when closed, causing operation of said vent valve means at one limiting position of the diaphragm.

19. The liquid driven diaphragm fluid pump of claim 12 wherein the reciprocating piston comprises a power means for driving a variable capacity load of pumped liquid, a driving liquid disposed between said reciprocating piston and said variable capacity load of pumped liquid, and automatically activated means responsive to the demand of said load for controlling the consumption of power of the prime mover.

*Panther's Evidence on the Contempt Issue*

Panther presented two expert witnesses: Schlosser, a defendant in the original suit and the inventor, while employed by Panther, of the two patents in suit, and Donald A. Fischer, former Dean of the School of Engineering at Washington University, who had been Panther's expert witness at the original trial in 1970.

Fischer compared the structure of the SPRAYMATE and the SPRAYMATE B and testified that their designs are identical, with but one exception. The SPRAYMATE has a solid, one-piece drive shaft connecting the piston with the motor, but the SPRAYMATE B has a multipart drive shaft connecting the piston with the motor, the shaft parts fitting together with a spring inside them. The SPRAYMATE B shaft is illustrated by one of Beck's exhibits (DTX–62), to which we have added reference numerals:

At the left, stem 4 is connected to the piston (not shown). The right end of shaft 2 is connected to the motor (not shown) which imparts a reciprocating motion to the entire assembly shown. Shaft 2 slides inside housing 5, an extension of stem 4. The end of shaft 2 has a head 1 which holds coil spring 3 against the inner shoulder of housing 5. In operation, spring 3 gives the SPRAYMATE B shaft about $\frac{1}{16}$ inch of "play," or lost motion, in a stroke length of about $\frac{1}{4}$ inch. It was stipulated that the spring-carrying external shaft is the *only* structural difference between the SPRAY-MATE and SPRAYMATE B.

Schlosser and Fischer testified that they performed three tests on both the original infringing SPRAYMATE and on the SPRAYMATE B. The first measured the electrical current required to operate each, while pumping and while on standby. The SPRAYMATE drew 15 amperes while pumping and 5 amperes on standby. The SPRAYMATE B drew 25 amperes while pumping and 10 amperes on standby.

The second test measured the quantity of ethylene glycol expelled from the driving fluid chamber during standby operation. The SPRAYMATE expelled 2.36 ounces in 30 seconds from a chamber capacity of 57.6 ounces. The SPRAYMATE B expelled $3\frac{3}{8}$ ounces in 30 seconds from a chamber capacity of 42.5 ounces. Fischer testified that this test "indicated to me that this [SPRAYMATE B] chamber wasn't filled with ethylene glycol all the time, there was vapor in there, and that there was cavitation."

The third test measured the amount of paint being pumped. The SPRAYMATE pumped 54 ounces in 30 seconds and the SPRAYMATE B pumped 45 ounces in 30 seconds. Neither the SPRAYMATE nor the SPRAYMATE B overheated during standby operation. As a result of their tests, Schlosser and Fischer testified that the SPRAYMATE and SPRAYMATE B operated in substantially the same way with substantially the same results.

*Beck's Evidence on the Contempt Issue*

Beck also presented two witnesses: Zar W. Kelley and Ellis H. Born. Kelley was the engineer who designed the spring-carrying external drive shaft assembly (shown above in DTX–62) for the SPRAYMATE B at Beck's request, after the injunction issued on November 24, 1970. Kelley testified that Beck employed him to design a pump that would "eliminate phase reversal cavitation," and that he designed the SPRAYMATE B shaft assembly for this purpose, completing the drawing shown in DTX–62 on February 2, 1971.

Kelley said his approach was to prevent the pressure in the driving fluid chamber from dropping "lower than the vapor pressure of ethylene glycol and, of course, that is where the phase reversal cavitation starts." Kelley found the vapor pressure of ethylene glycol (at "about" 190°F.) in the *Handbook of Chemistry and Physics* and, after a conversion calculation, said that this was "29.5 inches of mercury vacuum gauge reading." Through another series of calculations and conversions, Kelley determined that the force on the piston would have to be 18 pounds to produce such a low pressure (high vacuum). He stated that he used a 16-pound spring to keep the force on the piston below 18 pounds and thereby to keep the vacuum from dropping to 29.5 inches of

mercury (the vapor pressure of ethylene glycol).

Born, a research engineer, agreed with Kelley's calculations and with Kelley's testimony that a force less than 18 pounds pulling back on the piston would fail to create phase reversal cavitation in the ethylene glycol.

Born gave this definition of "vapor pressure" from p. 303 of *Mechanical Engineers' Handbook* (L. Marks ed. 1941) (exhibit DTX–79),

> Vapor Pressures. At a specified temperature, a pure liquid can exist in equilibrium contact with its vapor at but one pressure, its vapor pressure. A plot of these pressures against the corresponding temperatures is known as a vapor-pressure curve.

and this definition of "cavitation" from p. 12–2 of *Handbook of Fluid Dynamics* (V. Streeter ed. 1961) (exhibit DTX–78): "In most engineering contexts, *cavitation* is defined as the process of formation of the vapor phase of a liquid when it is subjected to reduced pressures at constant ambient temperature." (Emphasis in original.) Born testified regarding three *ex parte* tests conducted by him, illustrating his testimony by reference to photographs (DTX–74 a, b) of a court exhibit (DTX–77), comprising a replica or model of the SPRAYMATE B, which had a specially-constructed driving fluid chamber made from a clear plastic block, permitting him to see the ethylene glycol during standby operation. He stated that a commercial SPRAYMATE B "should have identical characteristics to those of the plastic model."

Born's first test measured, with a vacuum gauge, the lowest pressure (highest vacuum) attained in the driving fluid chamber of DTX–77 during standby operation. Born found that 19 inches of mercury vacuum was the highest vacuum attained in DTX–77. Thus, Born said that the pressure did not go low enough to equal the vapor pressure of ethylene glycol and that, therefore, DTX–77 "does not have phase reversal."

Born's second test on DTX–77 employed a pressure probe, with the reading displayed on an oscilloscope. Born testified that the visual display on the oscilloscope indicated that the highest vacuum in the driving fluid chamber on standby operation was 20 inches of mercury vacuum.

Born's third test on DTX–77 involved visual observation of the driving fluid through the plastic block during standby operation. Born testified that he "could not observe a true phase reversal phenomenon."

Neither Kelley nor Born conducted any tests whatever on the original, and infringing, SPRAYMATE pump.

After the contempt hearing, Panther moved to reopen under F.R.Civ.P. 59(a), on the ground that whether the pressure within the driving fluid chamber dropped to the vapor pressure of ethylene glycol during standby was not an issue in the original trial and that Panther had therefore been surprised by this evidence at the contempt hearing. Panther attached an affidavit by Frank A. Bower, who had now measured the vacuum achieved in the infringing SPRAYMATE during standby and had found it to be 19 inches of mercury gauge—identical to that achieved in the SPRAYMATE B as found by Born.

### *The District Court*

On the contempt issue, the district court held that Beck had not violated the 1970 injunction. It stated (424 F.Supp. at 818–20):

> The basic question which the court must determine is whether or not the modified device, in this case the Spraymate B pump, is the equivalent of the original device. *See e. g., Schlegel Manufacturing Company v. USM Corp.*, 525 F.2d 775 (6th Cir. 1975). * * *
>
> * * * The existence or non-existence of phase reversal cavitation is the crucial issue * * *. * * * Plaintiff, in the original trial and appeal, took the position that phase reversal cavitation occurred in the Spraymate pump. * * * [T]he Court of Appeals implied as much in its opinion when it stated that cavitation cooling was an element of the origi-

nal patented invention. *Panther Pumps & Equipment Co. Inc. v. Hydrocraft, Inc.,* [468 F.2d] at 230. Thus, phase reversal at the vapor pressure of the driving fluid was necessary in order to infringe upon the patents for the original Spraymate pump [sic, in order for the original SPRAYMATE pump to infringe the patents]. The Plaintiff, having taken this position at trial, cannot now alter it at the contempt proceeding. *Union Carbide & Carbon v. Graver Tank & Manufacturing Co.,* 196 F.2d 103 (7th Cir. 1952).
 \* \* \* The evidence presented does not convince me that phase reversal or cavitation takes place during the operation of the Spraymate B pump while on standby. The claims of the patents on [sic, infringed by] the original Spraymate pump require phase reversal cavitation and this process cannot take place unless the vacuum in the chamber is at the vapor pressure of the ethylene glycol fluid. The expert witnesses of the Defendant Beck testified that cavitation did not occur in the operation of the Spraymate B pump and I find that testimony persuasive. The testimony I have heard leads me to conclude that the Spraymate and the Spraymate B do not perform their functions in substantially the same fashion. The Spraymate B pump possesses a modified piston shaft with a spring device which limits the amount of force applied to pull the piston backward while in operation. By limiting the amount of force applied to the piston, through the utilization of the spring-loaded piston shaft, the inventor of the Spraymate B pump has prevented the occurrence of phase reversal or cavitation. Consequently, there can be no holding of contempt for the manufacture and sale of the Spraymate B.

Regarding substitution of Beck and Universal as defendants under Fed.R.Civ.P. 25(c), the district court held that rule inapplicable, stating (424 F.Supp. at 821–22):

Generally, Rule 25(c) applies only to actions which are pending. This case is no longer "pending", since it went to final judgment six years ago. However, the

Plaintiff urges that in certain situations, substitution of parties after entry of judgment is proper. *See generally,* 3B *J. Moore, Federal Practice* ¶ 25.03[1], at 25–101 (2d ed. 1975). The Plaintiff further contends that Beck and Universal Spray Systems became successors in interest of Hydrocraft at the time the parts inventory was transferred from Chicago to Cleveland. It is argued that Beck should be held liable for the $150,000 judgment entered against Hydrocraft because he engineered a fraudulent transfer of the assets of the original defendant so as to make Hydrocraft judgment-proof.

The very nature of Rule 25(c) vests a great deal of discretion in the hands of the court. It is not mandatory that a substitution be made in every case of a transfer of interest. *McComb v. Row River Lumber Co.,* 177 F.2d 129 (9th Cir. 1949). I personally have grave doubts about transferring liability to an individual and a corporation who were not parties to the original lawsuit. In my opinion, due process and principles of basic fairness require that an individual be given his day in court. Beck and Universal Spray Systems have never had the opportunity to present evidence against the imposition of liability with regard to the original infringement charge and, of course, the issue of liability is now immune from collateral attack. The Plaintiffs argue that Beck cannot complain of a denial of due process because he had ample opportunity to present evidence relating to the transfer of assets in 1970, during the contempt hearing held in April. By arguing in this fashion, the Plaintiff fails to understand the very nature of the due process right possessed by Beck and Universal Spray Systems. Beck and Universal *must* be given the opportunity to defend against the original infringement charge before liability is imposed upon them. They never had this opportunity, and the chance to present evidence relating to issues other than the original infringement in a later contempt hearing is not an adequate substitute. I

do not believe that Rule 25(c) can be utilized in the manner sought by the Plaintiff. The Federal Rules of Civil Procedure were not designed to avoid the constitutional requirement of due process of law. [Footnote omitted.] Once a case has proceeded to judgment, any opportunity a person such as Beck would have had to defend the infringement charge is lost permanently. It seems grossly unfair to impose a significant financial liability upon an individual under these circumstances and for these reasons, I will not do so.

Additionally, the Plaintiff claims that Beck should be held personally liable for the outstanding judgment because he is the alter ego of Defendant Hydrocraft. In essence, the Plaintiff is asking this court to "pierce the corporate veil" and impose liability upon Beck because he and Hydrocraft were, in reality, one single entity. In order to apply the alter ego doctrine, a finding of control and domination of the corporation on the part of the individual is necessary. *See e. g. U. S. v. Sancolmar Industries, Inc.*, 347 F.Supp. 404 (E.D.N.Y.1972). I cannot make such a finding based upon the record. The evidence presented during the contempt hearing does not show complete domination of the corporation entity by Beck. In the situation existing between Beck and Hydrocraft, there was no unity of interest between the individual and the corporation. The separate existence of the corporation was always maintained and Beck never exercised anything even resembling domination over Hydrocraft. He was simply an investor who left the day-to-day operations of the corporation in the hands of his two partners. Plainly, the facts present in this case do not allow me to pierce the corporate veil and impose personal liability upon Beck. *See generally, National Bond Finance Co. v.*

*General Motors Corp.*, 238 F.Supp. 248 (W.D.Mo.1964), *aff'd.*, 341 F.2d 1022 (8th Cir. 1965).

Finally, the district court denied Panther's motion to reopen (424 F.Supp. at 822):

This additional testimony would not dispel the fair ground of doubt which I have as to the contemptuous nature of the Defendant's conduct in manufacturing the Spraymate B. Therefore, it is pointless to hear this additional testimony.

*Issues*

The dispositive issues are whether the district court erred in (1) refusing to hold Beck in contempt and (2) refusing to add or substitute Beck and Universal as defendants. We do not reach the issue of whether it was error to deny the motion to reopen.

OPINION

I. *Contempt*

■ The district court held that it had jurisdiction over Beck, that he was bound by the 1970 injunction as an "officer" of Hydrocraft, and that he had notice of the injunction.[6] Beck has not appealed from these holdings, hence, they are res judicata.

Respecting the contempt issue, therefore, the questions are: (A) whether Universal's manufacture and sale of the SPRAYMATE B pump are attributable, "directly or indirectly," to Beck; and (B) whether the SPRAYMATE B pump is an "infringing product" as defined in the injunction.

A. *"Piercing the corporate veil"*

■ Universal's manufacture and sale of the SPRAYMATE B are manifestly the result, "directly or indirectly," of Beck's activities. The record shows that Beck employed Kelley in an effort to evade the

---

**6.** This proceeding was for the enforcement of the injunction and not to review or alter it. It was heard and determined as a proceeding for civil, not criminal, contempt. The proceeding is to be regarded as a part of the original cause, not as an independent one. *See Leman v. Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 452, 52 S.Ct. 238, 76 L.Ed. 389 (1932). Fed.R. Civ.P. 65(d) states: "Every * * * injunction * * * is binding only upon the parties to the action, their *officers*, * * * and upon those persons in active concert or participation with them who receive actual notice of the order * * * ." (Emphasis added.)

injunction, i. e., to design a pump which would "eliminate phase reversal cavitation" and that Kelley then promptly placed a spring in the piston shaft (DTX–62) of the infringing pump. Beck formed Universal, his solely-owned corporation, for the purpose of making and selling the SPRAY-MATE B.

And, as the district court said, "[d]uring late 1970 and early 1971, the parts inventory of Hydrocraft was physically transferred to Cleveland, at the direction of Louis Beck, where [it was] ultimately utilized by Universal Spray Systems, Inc." (424 F.Supp. at 820, footnote omitted). To borrow the Supreme Court's statement in *Pepper v. Litton*, 308 U.S. 295, 311, 60 S.Ct. 238, 247, 84 L.Ed. 281 (1939), "[h]e. cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly." Beck cannot use the corporate form to evade the prohibitions of the injunction which bound him. Universal being Beck's *alter ego*, its manufacture and sale of the SPRAYMATE B pump are attributable to Beck.

### B. The *SPRAYMATE B is an "infringing product"*

The 1970 injunction defines "infringing product" as, inter alia, "*any* colorable *imitation* or *equivalent* thereof, *including*, but not limited to, *the product identified * * * as Defendants' 'SPRAY MATE PUMP.'*" (Emphasis added.) Thus, the specific issue is whether the SPRAYMATE B pump is an *equivalent* of the infringing SPRAYMATE pump. If so, it is an "infringing product." Beck stipulated that the sole structural difference between the two pumps is that the SPRAYMATE B has the spring-carrying piston shaft, whereas the SPRAYMATE has a solid, one-piece piston shaft. Thus, the question is whether this single structural difference causes the SPRAYMATE B to have overall operating characteristics so different from the SPRAYMATE that the two pumps are not equivalents. We hold that it does not and that the pumps have equivalent operating characteristics.

Our approach follows the guidance of the Supreme Court in the leading case, *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 607–08, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950):

[C]ourts have * * * recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system.

The doctrine of equivalents evolved in response to this experience. The essence of the doctrine is that one may not practice a fraud on a patent. Originating almost a century ago in the case of *Winans v. Denmead*, 15 How. [56 U.S.] 330, 14 L.Ed. 717, it has been consistently applied by this Court and the lower federal courts, and continues today ready and available for utilization when the proper circumstances for its application arise. "To temper unsparing logic and prevent an infringer from stealing the benefit of an invention"[1] a patentee may invoke this doctrine to proceed against the producer of a device "if it performs substantially the same function in substantially the same way to obtain the same result." *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147. The

theory on which it is founded is that "if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape." *Machine Co. v. Murphy*, 97 U.S. 120, 125, 24 L.Ed. 935.

[1] L. Hand in *Royal Typewriter Co. v. Remington Rand*, 2 Cir., 168 F.2d 691, 692.

*Graver Tank* supplies these guidelines on determining equivalency:

What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.

A finding of equivalence is a determination of fact. Proof can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art. Like any other issue of fact, final determination requires a balancing of credibility, persuasiveness and weight of evidence. It is to be decided by the trial court and that court's decision under general principles of appellate review, should not be disturbed unless clearly erroneous. Particularly is this so in a field where so much depends upon familiarity with specific scientific problems and principles not usually contained in the general storehouse of knowledge and experience. [339 U.S. at 609–10, 70 S.Ct. at 856.]

The district court began its analysis by correctly noting that the injunction uses the term "equivalent" and that, therefore, the "basic question" (424 F.Supp. at 818) is one of equivalency between the SPRAYMATE B and the SPRAYMATE. But then, inexplicably, the district court stated that the "crucial issue" is the "existence or non-existence of phase reversal cavitation." (424 F.Supp. at 819.)

■ In the original trial and appeal, the SPRAYMATE was held an infringing product because it exhibited "cavitation cooling." In formulating the issue, the district court required that the SPRAYMATE B also exhibit cavitation cooling (though it described that theoretical phenomenon as "phase reversal cavitation"). Thus, the district court required identity of operation, not *equivalency* of operation. This was clear error.

■ The district court's finding that the SPRAYMATE B does not cavitate was premised on the theory that cavitation "cannot take place unless the vacuum [sic, pressure] in the chamber is at the vapor pressure of the ethylene glycol fluid," (424 F.Supp. at 819), a theory on which the court's attention was focused by Beck's witnesses Kelley and Born. While that theory would be applicable to a static fluid system, where cavitation of the entire system would be the same as boiling, the district court did not apply the theory to conditions required for initiation of cavitation at a specific place or point in a fluid subjected to a dynamic environment. The ethylene glycol in the driving fluid chamber of the SPRAYMATE B is not a static fluid. On the contrary, it is subjected to a dynamic environment, being violently agitated by the piston at 500 strokes per minute.

Born quoted to the court below only the first sentence on p. 12–2 of *Handbook of Fluid Dynamics* (V. Streeter ed. 1961) (exhibit DTX–78). The entirety of the first two paragraphs in that exhibit read:

Definitions and Scope. In most engineering contexts, *cavitation* is defined as

the process of formation of the vapor phase of a liquid when it is subjected to reduced pressures at constant ambient temperature. In general, a liquid is said to *cavitate* when vapor bubbles are observed to form and grow as a consequence of pressure reduction. When the phase transition is a result of pressure change by hydrodynamic means, a two-phase flow composed of a liquid and its vapor is called a *cavitating flow*. While these definitions imply a distinction between phase transitions associated with reduction of pressure, on the one hand, and addition of heat (i. e., *boiling*), on the other, heat-transfer effects may play an important role in many cases of cavitating liquids. Such effects are especially of importance in liquids near their boiling points. From a purely physical-chemical point of view, of course, no distinction need be made between boiling and cavitation, at least in so far as the question of inception is concerned, and many of the basic physical ideas regarding inception, vapor mass transfer, and condensation apply equally.

In a flowing liquid (or for a body moving through a stationary liquid), the parameter which describes the pressure conditions for similarity in the liquid-gas system is called the *cavitation number*, or *cavitation parameter*. It is a special case of the usual pressure coefficient and relates the pressure on the cavitating system (relative to the gas pressure) to the dynamic pressure. The magnitude of the cavitation number is an indication of the degree of cavitation or of the tendency to cavitate. It is defined as

$$\sigma = \frac{P - p_c}{1/2 \rho U^2}$$

in which $P$ = (absolute) static pressure at point of interest

$p_c$ = gas pressure (vapor pressure in a two-phase, one component flow or sum of partial pressure of vapor and other gas in a multicomponent system)

$\rho$ = mass density of liquid

$U$ = reference velocity

[Italics in original.]

Thus, according to the treatise of record, cavitation in a dynamic system is a complicated phenomenon and is dependent on far more than the vapor pressure of the liquid alone.

Quite apart, however, from any question of whether the district court may have been misled with respect to the technological evidence before it, and assuming, arguendo, the correctness of the finding that the SPRAYMATE B does not cavitate,[7] and that its operation is therefore not *identical* to that of the SPRAYMATE, that finding cannot end the inquiry on the issue of contempt. As above, indicated, the issue is not identity, but equivalency as defined in *Graver Tank, supra.*

The district court made no express finding on equivalency or non-equivalency. To the extent that an implied finding of at least partial non-equivalency may be seen in the court's statement: "[Beck] has convinced the court that the original SPRAYMATE and the SPRAYMATE B operate in a significantly different way due to the presence of the modified piston [shaft] assembly." (424 F.Supp. at 820), we hold that implied finding to have been clearly erroneous. The evidence simply does not show that the pumps operate "in a significantly different way." To the contrary, the evidence established that the original SPRAYMATE and the SPRAYMATE B operate in substantially the *same* way. That the SPRAYMATE B operates at an efficiency slightly less than that of the SPRAYMATE, because of lost motion occasioned by the spring in the piston shaft, cannot defeat the application of the equivalency doctrine where, as they are here, "the proper circumstances for its application arise," *Graver Tank, supra.*

First, the SPRAYMATE and SPRAYMATE B operate in accord with the same mechanical principles. The only mechanical effect of the insertion of the spring in the

---

**7.** Unlike Panther's experts, Born did not perform pressure measurements on the product on which the contempt charge rested, a *commercial* SPRAYMATE B, but only on the specially-constructed plastic block model (exhibit DTX–

77). Born conceded that his measurements would *not* be the same on a commercial SPRAYMATE B because the "pressures were limited because of the strength of the plexiglass material."

SPRAYMATE B is a shortening of the ¼-inch stroke of the SPRAYMATE piston to a ³⁄₁₆-inch stroke.

Second, the SPRAYMATE and the SPRAYMATE B exhibit significantly reduced power consumption on standby operation, one of the main objectives of the patented invention.[8]

Third, the SPRAYMATE and SPRAYMATE B operate on standby with a driving fluid chamber only partially filled with ethylene glycol. This less-than-full driving fluid chamber (during standby) reduces the workload on the motor and produces the beneficial reduction in power consumption exhibited by both pumps.

Fourth, the SPRAYMATE and the SPRAYMATE B pump approximately the same amount of paint when pumping.

Finally, and perhaps most tellingly, the SPRAYMATE and the SPRAYMATE B *avoid* overheating of the driving fluid *without* using auxiliary cooling equipment, the main advance of the patented invention over the prior art. Beck made no attempt to explain how the SPRAYMATE B achieves this beneficial cooling result without the use of auxiliary cooling equipment. The entire defense to the charge of contempt herein resided in an effort to prove one fact: that there is no "true" cavitation in the SPRAYMATE B. The defense must fail in light of the more probative fact: *that the SPRAYMATE B does not overheat.* The absence of overheating completes the portrayal of equivalent operating characteristics, and convincingly documents the fact that the SPRAYMATE B does everything the SPRAYMATE did. Panther has convincingly carried its burden of showing the equivalency of the SPRAYMATE B and the infringing SPRAYMATE product.

As stated in *Graver Tank, supra*: "equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case." In the present case, the patents in suit, the prior art, and the evidence comparing the SPRAYMATE and SPRAYMATE B, collectively demonstrate equivalency. The two pumps perform the same work in substantially the same way to accomplish the same result, pumping essentially the same amount of paint per unit of time, and operating on standby with reduced power consumption, with a partially-filled driving fluid chamber, without overheating, and without auxiliary cooling equipment.

Civil contempt "is a severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct," *California Paving Co. v. Molitor*, 113 U.S. 609, 618, 5 S.Ct. 618, 622, 28 L.Ed. 1106 (1885). We find no fair ground of doubt, however, that the SPRAYMATE and SPRAYMATE B are equivalent pumps. Having been enjoined from producing and selling an equivalent pump, it was incumbent on Beck to exercise care in avoiding such conduct. *Kiwi Coders Corp. v. Acro Tool & Die Works*, 250 F.2d 562, 568 (7th Cir. 1957); *National Rejectors, Inc. v. A. B. T. Mfg. Corp.*, 188 F.2d 706, 710 (7th Cir.), *cert. den.*, 342 U.S. 828, 72 S.Ct. 51, 96 L.Ed. 626 (1951); *Blair v. Jeannette-McKee Glass Works*, 161 F. 355, 358 (C.C.W.D.Pa.1908).

Beck argues that Panther is barred by laches. Though the district court did not rule on laches, the evidence convinces us that Panther had no knowledge of Universal's manufacture and sale of the SPRAYMATE B until 1975, when Schlosser and Drath so informed Panther. Panther filed the present action on February 3, 1976. Thus, there was no long period of inaction by Panther after it learned of Beck's contemptuous activities, and no credible evidence that Beck in any manner relied on any inaction or acquiescence of Panther. Beck's reliance on *Lewis Invisible Stitch Mach. Co. v. Popper*, 33 F.Supp. 812 (E.D.N.

8. Claim 22, *supra*, recites "limit[ing] horsepower consumption" as the purpose of the "cyclic vaporizing and condensing." Claim 19, *supra*, recites a "means * * * for controlling the consumption of power of the prime mover."

Y.1940), *aff'd on other grounds*, 118 F.2d 191 (2nd Cir. 1941), is misplaced. In that case the plaintiff knew of violations of an injunction for a period of over four years before taking action.

We conclude that the district court erred in discharging the order to show cause directed to Beck. Beck acted in civil contempt of court by making and selling the SPRAYMATE B, an "infringing product" as defined in the November 24, 1970 injunction.

## II. *Substitution of Defendants*

Prior to the contempt hearing, Panther moved under Fed.R.Civ.P. 25(c), *supra* note 5, to add or substitute Beck and Universal as defendants. The motion recited that the charter of original defendant Hydrocraft had been cancelled by Ohio in 1975 and that:

Louis Beck and Universal Spray Systems, Inc. are successors in interest of Hydrocraft, and should be substituted or added as defendants in this aciton [sic] pursuant to Rule 25(c), Fed.R.Civ.P.

* * * Louis Beck admitted in his deposition that he acquired substantially all of the assets and inventory of Hydrocraft and transferred the assets and inventory to Universal Spray Systems, Inc., a company which he entirely owns. Beck in his deposition also admitted that he purchased each of the one-third interests in Defendant Hydrocraft from Edwin Drath and Paul Schlosser after entry of the Judgment and became the sole stockholder of Hydrocraft. Prior to becoming sole stockholder of Hydrocraft, Beck had been its president and one-third stockholder.

In addition, Beck received in Cleveland 11 tons of inventory from Hydrocraft and transferred it to his wholly owned company, Universal Spray Systems, Inc. The inventory was shipped after entry of

Judgment and Injunction in this action without any monetary consideration for the transfer being received by Hydrocraft. The shipped inventory constituted substantially all of the assets of defendant and by taking such action Beck was able to enrich another company under his control and avoid seizure of the assets by plaintiff. The inventory was sold by Louis Beck and Universal Spray Systems, Inc. Not only did Beck and Universal Spray Systems, Inc., gratuitously receive the assets of Hydrocraft, Beck began to manufacture and sell a colorable imitation of a pump adjudged by this court to be an infringement of the patents in suit.

* * * In this present case, Beck and Universal Spray Systems, Inc. did not even purchase the assets but gratuitously received them to avoid seizure by plaintiff. Under the circumstances, it is believed clear that the receipt by Beck and Universal Spray Systems, Inc. of the assets of Defendant Hydrocraft constituted a transfer of interest within the meaning of Rule 25(c).

* * * Beck has stated in his deposition that he is sole stockholder of Universal Spray Systems, Inc. Since the company ultimately receiving the assets is under the sole control of Beck, this company merely acts as his alter ego and thus Beck is a successor in interest and must be personally liable as well as his corporate entity. * * *

* * * For these reasons, it is requested that Louis Beck and Universal Spray Systems, Inc. be added or substituted as party defendants in this action and be bound by the Judgment of $150,-000 rendered against the transferor Hydrocraft.

Clearly, the question raised in the foregoing motion is whether Beck and Universal are successors in interest of Hydrocraft, and therefore liable on the 1970 judgment affirmed by this court in 1972.

■ The district court denied Panther's motion.[9]

---

9. Beck argues that denial of a motion to substitute is not an appealable order, citing *Virginia*

*Land Co. v. Miami Shipbuilding Corp.*, 201 F.2d 506 (5th Cir. 1953). That case merely held that

## A. *Universal*

■ The motion to substitute Universal faces an insurmountable obstacle: lack of personal jurisdiction. "The consistent constitutional rule has been that a court has no power to adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110, 89 S.Ct. 1562, 1569, 23 L.Ed.2d 129 (1969). The district court's order to show cause was directed *only* to Beck; it did not bring Universal before the lower court. Although we have held, *supra*, that Universal is merely Beck's *alter ego*, that fact cannot alone confer personal jurisdiction over Universal. Accordingly, the appeal from the denial of the motion to substitute Universal is dismissed.

## B. *Beck*

Respecting Beck, however, the lower court held that it had personal jurisdiction over Beck and he has not appealed that ruling. It is res judicata that the order to show cause was properly issued by the district court and that it subjected Beck to the district court's jurisdiction.

■ Notwithstanding its clear jurisdiction over Beck, the district court first held that Rule 25(c) "applies only to actions which are pending" and that "[t]his case is no longer 'pending' because it went to final judgment [in 1970]." (424 F.Supp. at 821.) We agree that Rule 25 applies only to pending actions, but disagree with the view that this case is not pending. As stated in *Moore's Federal Practice*,

> Rule 25 has application only to actions pending in the district courts. But this should not preclude substitution after judgment has been rendered in the district court * * * for the purpose of subsequent proceedings to enforce * * * a judgment. [3B *Moore's Federal Practice* ¶ 25.03[1], at 25–101 (2d ed. 1977), footnote omitted.]

This case is a subsequent proceeding to enforce the judgment (and injunction) rendered in 1970; it is therefore pending *again*, and Rule 25 applies.

The district court next held that substitution of a party under Rule 25(c) is discretionary. The Rule has been so interpreted (*see McComb v. Row River Lumber Co.*, 177 F.2d 129 (9th Cir. 1949) and 3B *Moore's Federal Practice* ¶ 25.08, at 25–322 (2d ed. 1977)). From the strict language of the rule, that it is "the action * * * by or against the original party" which "may be continued," Rule 25(c) may be viewed as presuming that the transferee will be made a party. Under that interpretation discretion would relate only to *continuation against the original party*. That view of Rule 25(c) would also accord with Fed.R. Civ.P. 17(a), which states: "Every action shall be prosecuted in the name of the real party in interest," and substitution under Rule 25(c) would be required by Rule 17(a) when the transferee of an interest is the real party in interest and where as here, the original party (Hydrocraft) has been dissolved.

However, for purposes of this appeal, we will assume, as prior courts appear to have assumed, that application of Rule 25(c) to the substitution of a transferee is discretionary and consider whether the exercise of that discretion in the present case constitutes an "abuse of discretion," applying to the term "abuse" its particular legal meaning:

> The term abuse, however, when applied to a court's exercise of its discretion is peculiarly of legal significance, wholly unrelated to the meaning of the same term when used in common parlance. Action that would be necessary in ordinary affairs to make one guilty of an abuse connotes conduct of a different grade than what is meant when a court is

such an order "was not a final decision, within the meaning of 28 U.S.C.A. § 1291, in that the order * * * was not * * * an order of dismissal." (201 F.2d at 508.) In the instant

case, however, there has been a "final decision" of the district court within the meaning of 28 U.S.C. § 1291 (1970) and review of the order denying substitution of Beck is now ripe.

said to have abused its discretion. Abuse of discretion in law means that the court's action was in error as a matter of law. And where such abuse exists, reversal will be ordered. See *Cervin v. W. T. Grant Co.*, 5 Cir., 100 F.2d 153, 155, 156. [*Beck v. Wings Field, Inc.*, 122 F.2d 114, 116 (3rd Cir. 1941).]

The district court rested its exercise of discretion here on the view that the "constitutional requirement of due process of law" prevents substitution because "Beck * * * *must* be given the opportunity to defend against the original infringement charge before liability is imposed upon [him]." (424 F.Supp. at 821, emphasis in original.)

The Fifth Amendment states: "No person shall * *. * be deprived of life, liberty, or property, without due process of law * * *." Chief Justice Warren, speaking for the Supreme Court in *Hannah v. Larche*, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960), stated that:

"Due process" is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. * * * [A]s a generalization, it can be said that due process embodies the differing rules of fair play, which through the years have become associated with differing types of proceedings. Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account. * * *

There can be no question that Beck is entitled to the rights protected by the Due Process Clause. Beck is certainly entitled to an opportunity to defend *any* charge made against him. The error in the district court's holding resides in a misperception of the charge against Beck, i. e., in a misperception of the "nature of the alleged right involved" and "the nature of the proceeding" referred to in *Hannah, supra.*

Beck, in the motion to substitute, was not charged with "the original patent infringement." Beck was charged with acts by which he became the successor in interest of Hydrocraft, a judgment debtor. The nature of the original tort that resulted in the judgment is immaterial. It could have been libel, slander, assault, battery, patent infringement or some other tort. The charge was (and is) that Beck is the successor in interest of the judgment debtor and, therefore, liable on the judgment. Against this charge, Beck was entitled under the Due Process Clause to an opportunity to defend himself—to confront the witnesses against him, to cross-examine them, to present evidence in his favor, etc. The record shows that Beck has had his day in court, in a hearing lasting two weeks, on the charge that he is Hydrocraft's successor in interest. There has been no denial of procedural due process.

On the merits of that charge, the unique, overall circumstances of this case demonstrate, as a matter of substantive law, that Beck is the successor in interest of Hydrocraft. In *Wawak Co. v. Kaiser*, 90 F.2d 694, 697 (9th Cir. 1937), this court stated: "a 'successor' is one who succeeds or takes the place of another." The facts clearly show that Beck took the place of Hydrocraft. We hold, therefore, that Beck is Hydrocraft's successor in interest and should be substituted as defendant under Rule 25(c), the procedural rule which must, of course, follow substantive law.

In *Forest Laboratories, Inc. v. Pillsbury Co.*, 452 F.2d 621 (7th Cir. 1971), Judge Cummings, speaking for this court, stated:

The well settled rule of American jurisdictions * * * is that a corporation which purchases the assets of another corporation does not, by reason of succeeding to the ownership of property, assume the obligations of the transferor corporation. 15 Fletcher, Cyclopedia of the Law of Private Corporations, § 7122 (1961 Rev. Vol.); *Pennison v. Chicago, Milwaukee & St. Paul Ry. Co.*, 93 Wis. 344, 67 N.W. 702 (1896); *Kloberdanz v. Joy Mfg. Co.*, 288 F.Supp. 817, 820 (D.Colo.1968); *International Ass'n of Machinists and Local Lodge No. 954 v.*

*Shawnee Indus., Inc.*, 224 F.Supp. 347, 352 (W.D.Okl.1963). *Exceptions* to this rule exist where (a) the purchasing corporation expressly or impliedly agrees to assume the liabilities of the seller, (b) the transaction amounts to a consolidation or merger of the two companies, *(c) the purchasing corporation is merely a continuation of the selling corporation, or (d) the transaction is entered into fraudulently to escape liability.* [Emphasis added.] Fletcher, *supra*, at 191–195; *Kloberdanz v. Joy Mfg. Co., supra; International Ass'n of Machinists and Local Lodge No. 954 v. Shawnee Indus., Inc., supra.* Accord, *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 182 n.5, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); *R. J. Enstrom Corp. v. Interceptor Corp.*, 555 F.2d 277, 281–82 (10th Cir. 1977).

In the instant case, the facts show that exceptions (c) and (d), *supra*, are present and applicable.

(1) *Universal, Beck's alter ego, is merely a continuation of the selling corporation*

As Panther's motion recited, and as the evidence proved, Beck employed the instrumentality of his *alter ego*, Universal, to effect a continuation of Hydrocraft's business. The operative facts are: (1) the very inventory of parts which Hydrocraft had been using to make the SPRAYMATE was transferred to Universal and used to make the SPRAYMATE B, a substantially identical product (the piston shaft being the only change); and (2) SPRAYMATE, the trademark used by Hydrocraft, was used by Universal, with the mere addition of "Model B." In essence, the entire business of Hydrocraft, 100% owned by Beck, was transferred by Beck to Universal, also 100% owned by Beck.

In *Brunswick Corp. v. Chrysler Corp.*, 408 F.2d 335 (7th Cir. 1969), Chrysler purchased the entire business of The West Bend Company relating to outboard motors and inboard-outboard stern drives. Prior to the purchase, West Bend had accepted a consent decree admitting infringement of two patents on outboard motors. The question was whether Chrysler was in privity with West Bend. This court stated:

The District Court made no decision on the question of privity. It is Chryslers' position that although it purchased the entire business of The West Bend Company relating to outboard motors and inboard-outboard stern drives, it was not a corporate successor to The West Bend Company; that it had no interest or control in the prior suit and is, therefore, not bound by the decree that was entered.

To determine whether privity existed, we must determine whether Chrysler has succeeded in interest to the subject matter of the prior decree.

In *J. R. Clark Company v. Jones & Laughlin Steel Corp.*, 7 Cir., 1961, 288 F.2d 279, we affirmed a decision for *res judicata* where the defendant was not a corporate successor but had purchased that portion of the business of the previous defendant relating to the manufacture of ironing boards including a stock of ironing tables, tools and various other equipment. In *Clark, supra* at page 280 we said: "The case at bar is not one where a vendee merely purchased one or some limited amount of the alleged infringing product. Here, the defendant purchased from the manufacturer the entire business that was devoted to the production of ironing tables."

In the case at bar, Chrysler purchased from The West Bend Company the entire business that was devoted to the production of "Tiger Shark 800" outboard motors and the inboard-outboard stern drives used with such motors. Furthermore, The West Bend Company, having ceased all operations in the field of outboard motors, transferred both its manufacturing and sale facilities and also its personnel to Chrysler. It follows that Chrysler does stand in the shoes of The West Bend Company with respect to the decree in No. 61–C–102 [the prior action].

We hold that as the proof establishes Chrysler succeeded in interest to the subject matter of the prior decree, it is in privity with The West Bend Company,

and is bound by the provisions of the decree entered in No. 61–C–102. [408 F.2d at 338.]

### (2) *The transfer was a fraudulent effort to escape liability*

The evidence demonstrates that the transfer of assets from Hydrocraft to Universal was fraudulent and done to escape liability on the judgment. The testimony of Schlosser and Drath, corroborated by Drath's notes, established that Beck had devised a scheme to escape the judgment (and injunction) at the time of the October 8, 1970 meeting in Chicago. Except for the substitution of Cleveland for Europe, Beck implemented his scheme precisely as described in the testimony.

In *Wabash, St. Louis & Pac. Ry. Co. v. Ham*, 114 U.S. 587, 594, 5 S.Ct. 1081, 1084, 29 L.Ed. 235 (1885), the Supreme Court stated:

The property of a corporation is doubtless a trust fund for the payment of its debts, in the sense that when the corporation is lawfully dissolved and all its business wound up, or when it is insolvent, all its creditors are entitled in equity to have their debts paid out of the corporate property before any distribution thereof among the stockholders. It is also true, in the case of a corporation, as in that of a natural person, that any conveyance of property of the debtor, without authority of law, and in fraud of existing creditors, is void as against them.

And 15 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 7125 (1973 Rev. Vol.), states:

The rule that a corporation taking a transfer of the property and franchises of another corporation takes the same free from any liability for the general debts of the latter does not apply where the transfer constitutes, either in fact or as a matter of law, a fraud upon the creditors of the other corporation. * * * If the

sale is not a bona fide one for a valuable consideration and in the usual course of business, the purchaser is liable for the debts of the seller. [Footnote omitted.]

Hydrocraft's Chicago inventory was substantially the only corporate asset which would have been available to satisfy Panther's judgment.[10] However, Beck converted that inventory to his own use by transferring it to Cleveland, first to Becks Spray Systems, Inc. and then to Universal where it was consumed in making SPRAYMATE B pumps. This was a fraudulent conveyance. In *Landers Frary & Clark v. Vischer Products Co.*, 201 F.2d 319, 324 (7th Cir. 1953), this court stated:

In Illinois, a corporation has no right to give away its property leaving its creditors unpaid. Consequently any transfer of its assets not made in the usual course of business and for an adequate consideration will be set aside and the lien of the creditors enforced in equity. *Bouton v. Smith*, 113 Ill. 481. The test in determining the validity of a voluntary conveyance such as we have here as against creditors is whether or not it directly threatens to or does impair or endanger the rights of creditors, *Birney v. Solomon*, 348 Ill. 410, 181 N.E. 318, for, as the court said there, a debtor must be just before he is generous and though a donor may make a conveyance with the most upright of intentions, yet, if the transfer hinders, delays or defrauds his creditors it may be set aside as fraudulent. The intent or motive is immaterial; if the transfer directly tends to or does impair the rights of creditors, it is fraudulent in law irrespective of intent. *Second Nat. Bank of Robinson v. Jones*, 309 Ill.App. 358, 33 N.E.2d 732; *Marmon v. Harwood*, 124 Ill. 104, 16 N.E. 236; *McKey v. McCoid*, 298 Ill. 566, 132 N.E. 233.

The transfer of the inventory, which Beck admitted (note 3, *supra*) belonged to Panther, to Cleveland was a violation of

---

10. The reasons for Panther's apparent willingness to rely on the injunction alone, for its surprising failure to obtain a supersedeas bond or to move to sequester assets following judg-

ment, and for its failure to seek execution of judgment following appeal and denial of certiorari, do not appear in the record.

Panther's rights as a judgment creditor. Despite his admission in open court, Beck argues that Hydrocraft was in debt to him in the amount of his invested capital. However, the Hydrocraft preincorporation agreement (exhibit DTX–1), the basis for his argument, states that "the Beck invested capital will be returned to Beck as monies become available *through profits* from the sale of the corporation's products." (Emphasis added.) Hydrocraft had no profits, so Beck never became entitled to a return of invested capital.

In *Blackinton v. United States*, 6 F.2d 147 (8th Cir. 1925), one corporation bought all the shares of another and took over its property (goods in inventory), leaving nothing in its place. The Eighth Circuit stated: "Clearly, this cannot be done in any way that will leave the creditors of that company without remedy. Such an absorption of assets carries with it necessarily a liability for the debts which those assets might have paid." (6 F.2d at 148.) So here, Beck purchased all of the corporate shares of Hydrocraft for $200 and looted Hydrocraft of its valuable inventory of parts—an asset that would have been available to satisfy, in whole or in part, Panther's judgment.

In *Texas Co. v. Roos*, 93 F.2d 380 (5th Cir. 1937), a parent corporation caused its subsidiary to pay the parent large dividends during the pendency of the plaintiff's suit against the subsidiary, leaving the subsidiary insolvent and preventing collection of plaintiff's judgment. Liability on the judgment was enforced directly against the parent corporation. The Fifth Circuit stated:

The payment of these dividends should be avoided and set aside, as to [plaintiff], as a fraud upon his rights. Equity has full power to grant relief. Ignoring the corporate entity, the court below went to the heart of the matter and did justice by granting a decree against the [parent] Corporation; citing *Southern Pacific Co. v. Lowe*, 247 U.S. 330, 38 S.Ct. 540, 62 L.Ed. 1142; *Centmont Corp. v. Marsch* (C.C.A.) 68 F.2d 460; *Woodbury v. Pickering Lumber Co.* (D.C.) 10 F.Supp. 761, 766; *Commerce Trust Co. v. Woodbury* (C.C.A.) 77 F.2d 478, 487; *Page v. Arkansas Natural Gas Corp.* (C.C.A.) 53 F.2d 27, 38; *Trustees, etc. v. Payne* (C.C.A.) 65 F.2d 103, 107; *Majestic Co. v. Orpheum Circuit* (C.C.A.) 21 F.2d 720, 724; *In re Kentucky Wagon Mfg. Co.* (D.C.) 3 F.Supp. 958, 962. Preserving the fiction of separate legal entities, it might have accomplished the same thing by setting aside the fraudulent transfer of assets and levying by equitable attachment or garnishment upon the funds of the judgment debtor in the hands of the [parent] Corporation. As the same result and the right result was reached in the direct method followed by the court below, no one may complain, especially as the insolvent corporate debtor has only one creditor and only one stockholder. [93 F.2d at 383.]

In the present case, Beck, during the pendency of the original litigation, made Hydrocraft judgment-proof by transferring the inventory to Cleveland. Beck did this by means of his effective 100%-stock ownership of Hydrocraft after the meeting held in Chicago on October 8, 1970 where Schlosser and Drath agreed to sell their shares. Beck then proceeded, with full knowledge of the district court's judgment, to render Hydrocraft a worthless shell of a corporation. At the same time, Beck continued to control Hydrocraft's interests by appealing from that judgment, by returning to the district court to seek relief from that judgment under Fed.R.Civ.P. 60(b), and by petitioning for certiorari from this court's affirmance as to Hydrocraft.

For $200, Beck became owner of 100% of Hydrocraft's stock. He then proceeded to drain off its only significant asset. At the same time, he caused Hydrocraft to pursue an appeal to this court, seeking a reversal of the judgment. If the judgment were reversed, he would pay nothing. If it were affirmed, he would pay also nothing, because he was "not a party" and he had made Hydrocraft judgment-proof. One who attempts fraudulently to evade the judgment of a court does so at his peril. After the entry of judgment in 1970, Beck,

28

by his own acts, made himself successor of Hydrocraft. As such, he acquired not only its assets but its liabilities.

 It is well-established that a transferee pendente lite may be added or substituted in place of the original party to the action. See cases cited in 3B *Moore's Federal Practice*, ¶ 25.08, at 25–323 n. 7 & 8. (2d ed. 1977). In the instant case, the transfer of interest was pendente lite, that is, after entry of judgment but before the appeal was decided by this court. However, the transfer was secret, unknown to Panther until 1975, and Panther's motion could not have been filed earlier. Now that the facts are fully revealed, substitution is proper and should be effected in the interest of justice.

Beck asserts laches as a defense against substitution, arguing, in effect, that the success of his secret transfer should be recognized. The district court did not rule, but the record is clear that the defense must fail on any one of three grounds: (1) the inequity of allowing the secret transfer to succeed and the lack of reliance by Beck on any acquiescence of Panther, (2) lack of knowledge of Panther until 1975, and (3) Fed.R.Civ.P. 69(a), under which the "procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held," the statute of limitations on execution of judgments in Illinois being 7 years.[11] Ill.Rev.Stat., Ch. 77, § 6.

*Summary*

·Accordingly, we vacate the order of the district court and remand the case with instructions: (1) to issue an order holding Beck in civil contempt of court, the contempt consisting in a violation of the terms of the November 24, 1970 injunction by

making and selling an "infringing product" (the SPRAYMATE Model B) as defined in that injunction; (2) to issue an order substituting Beck as a defendant in this, the original, case; and (3) to proceed with an accounting. The appeal from the denial of the motion to substitute Universal is dismissed.

It is so ordered.

11. *Reconstruction Finance Corp. v. Goldberg*, 143 F.2d 752, 759 (7th Cir.), *cert. den.*, 323 U.S. 770, 65 S.Ct. 117, 89 L.Ed. 616 (1944), quoted the following from *Luttrell v. Wyatt*, 305 Ill. 274, 283, 137 N.E. 95, 98 (1922):

Mere delay alone, for a period less than that covered by the statute of limitations, is not laches that constitutes a defense. It is only when the delay is accompanied by some other element, rendering it inequitable for the complainant to assert his right, that the laches will bar his right within the statutory period.