STANDARD FEDERAL BANK (formerly known as Heritage Federal Savings Bank), Plaintiff,

v.

UNITED STATES, Defendant.

No. 92–844C.

United States Court of Federal Claims.

Feb. 25, 2002.

Edward L. Lublin, and Lawrence S. Sher, Dyer, Ellis & Joseph, Washington, D.C., for plaintiff.

Gary J. Dernelle, Trial Attorney, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, United States Department of Justice, Civil Division, Commercial Litigation, Washington, D.C., for defendant.

## OPINION

HORN, Judge.

In this *Winstar*-related case, the original plaintiff, Heritage Federal Savings Bank (Heritage), filed a complaint on December 9, 1992 alleging breach of contract and, alternatively, deprivation of property without just compensation or due process of law by the United States. The *Winstar*-related cases were consolidated before then Chief Judge Smith for case management purposes. On June 3, 1993, Judge Smith stayed this and other *Winstar*-related cases pending review in the United States Court of Appeals for the Federal Circuit, and then in the United States Supreme Court, of certain liability issues. In 1997, after the stay was lifted, plaintiff submitted a motion for partial summary judgment on contract liability to which the defendant responded with a cross-motion for partial summary judgment on liability. Action on plaintiff's takings claims was stayed on November 2, 2000. Subsequently, the cases were distributed to individual members of the court. Following the transfer of the above docket numbered case to this judge on December 15, 2000, this court scheduled a status conference and requested

additional memoranda from both parties. In a filing submitted to this court on February 2, 2001, defendant stated that it had "determined based upon the facts in this case and established legal principles, not to contest the existence of a contract or a breach [between the United States and Heritage]." Therefore, the government acknowledged, for the purposes of the case, that a contract existed between it and Heritage and that the government had breached the contract when Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183. The government stated, however, "[w]e do not concede that the breach caused any damages or that the named plaintiff is the real party in interest." Moreover, the government maintains in its Supplemental Motion for Summary Judgment that it is entitled to summary judgment because when Heritage merged with Standard Federal Savings Bank (Standard Federal) in December of 1993, the interest in the instant claim against the government was transferred to the former shareholders of Heritage Bankcorp. Heritage's holding company, and that the shareholders are not entitled to bring suit in this court. For the reasons set out below, the court grants plaintiff's motion for partial summary judgment on contract liability and denies defendant's cross-motion for partial summary judgment on liability and defendant's Supplemental Motion for Summary Judgment.

## FINDINGS OF FACT

The events that precipitated this and other *Winstar*-related cases were described in the plurality opinion of the United States Supreme Court in *United States v. Winstar Corp.*, 518 U.S. 839, 844–48, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). While a full recitation of those events is unnecessary in this opinion, an outline of the facts and the regulatory system in effect during the critical period of time may be useful to place the instant case in context. The starting point is the passage of three statutes during the Great Depression intended to stabilize the savings and loan industry:

The Federal Home Loan Bank Act created the Federal Home Loan Bank Board (Bank Board), which was authorized to channel funds to thrifts for loans on houses and for preventing foreclosures on them. Ch. 522, 47 Stat. 725 (1932) (codified, as amended, at 12 U.S.C. §§ 1421–1449 (1988 ed.)); *see also* [H.R.Rep. No. 101–54, pt. 1, 292 (1989), U.S.Code Cong. & Admin.News 1989, pt. 1, 86, 88 ]. Next, the Home Owners' Loan Act of 1933 authorized the Bank Board to charter and regulate federal savings and loan associations. Ch. 64, 48 Stat. 128 (1933) (codified, as amended, at 12 U.S.C. §§ 1461–1468 (1988 ed.)). Finally, the National Housing Act created the Federal Savings and Loan Insurance Corporation (FSLIC), under the Bank Board's authority, with responsibility to insure thrift deposits and regulate all federally insured thrifts. Ch. 847, 48 Stat. 1246 (1934) (codified, as amended, at 12 U.S.C. §§ 1701–1750g (1988 ed.)).

*United States v. Winstar Corp.*, 518 U.S. at 844, 116 S.Ct. 2432.

The regulatory system outlined by these three statutes worked well until the late 1970s and early 1980s. *Id.* at 845, 116 S.Ct. 2432. Between 1981 and 1983, however, 435 savings and loan operations failed. *Id.* Efforts by the government to deregulate the industry only exacerbated the problem, and by 1985 the estimated cost to the government to close insolvent thrifts rose to $15.8 billion, $11.25 billion more than the Federal Savings and Loan Insurance Corporation's (FSLIC) total reserves. *Id.* at 847, 116 S.Ct. 2432.

Realizing that FSLIC lacked the funds to liquidate all of the failing thrifts, the Bank Board chose to avoid the insurance liability by encouraging healthy thrifts and outside investors to take over ailing institutions in a series of "supervisory mergers." *See* GAO, Solutions to the Thrift Industry Problem 52; L. White, The S & L Debacle: Public Policy Lessons for Bank and Thrift Regulation 157 (1991) (White). Such transactions, in which the acquiring parties assumed the obligations of thrifts with liabilities that far outstripped their assets, were not intrinsically attractive to healthy institutions; nor did FSLIC have sufficient cash to promote such acquisitions through direct subsidies alone, although cash con-

tributions from FSLIC were often part of a transaction. *See* M. Lowy, High Rollers: Inside the Savings and Loan Debacle 37 (1991) (Lowy). Instead, the principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations.

*Id.* at 847–48, 116 S.Ct. 2432 (footnote omitted).

On October 31, 1986, Heritage merged with Family Federal Savings and Loan Association of Saginaw, Michigan (Family Federal), a failing thrift. According to plaintiff, Heritage assumed approximately $37,000,000.00 in liabilities in the merger. To facilitate the merger, the FSLIC entered into an assistance agreement with Heritage. Under the assistance agreement, Heritage received an initial cash contribution from the FSLIC in the amount of $12,900,000.00. The assistance agreement allowed Heritage to credit the cash contribution towards its regulatory net worth account.[1]

Section eighteen of the assistance agreement states:

> This agreement, together with any interpretation or understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with it, excepting only the Merger Agreement and any resolutions or letters concerning the Merger or this Agreement issued by the Bank Board or the CORPORATION [FSLIC] in connection with the approval of the Merger and this Agreement, *provided*, however, that in the event of any conflict, variance, or inconsistency between this Agreement and the Merger Agreement, the provisions of this Agreement shall govern and be binding on all parties insofar as the rights, privileges, duties, obligations, and liabili-

ties of the CORPORATION [FSLIC] are concerned.

(Emphasis in original).

Prior to the execution of the assistance agreement and the merger agreement, the Federal Home Loan Bank Board (Bank Board) issued three resolutions approving Heritage's merger with Family Federal. Resolution 86–1141 authorized the Secretary of the Bank Board to issue a forbearance letter to Heritage regarding supervisory forbearance by the Bank Board and the FSLIC of certain regulatory requirements. Resolution 86–1142 authorized the Director of the FSLIC to take necessary action and incur and pay expenditures in order to fulfill the rights, duties and obligations of the FSLIC under the assistance agreement. Resolution No. 86–1143 approved the merger of Family Federal with Heritage. The forbearance letter authorized by Resolution No. 86–1141, signed by the Secretary of the Bank Board on December 4, 1986, after the merger, allowed Heritage to record the excess liabilities it had received in the merger as an unidentifiable, intangible asset, known as supervisory goodwill. From Heritage's perspective, accounting for supervisory goodwill as regulatory capital was beneficial because it raised the institution's reserves, and, therefore, allowed the thrift to leverage more loans. In the letter from the Bank Board, Heritage was authorized to amortize the supervisory goodwill, under the purchase method of accounting, over a period not to exceed twenty-five years.

Congress enacted FIRREA in August of 1989. Pub.L. No. 101–73, 103 Stat. 183. FIRREA required the promulgation of new capital standards for the savings and loan industry which did not allow thrifts to use supervisory goodwill in calculating their regulatory net worth, following a phase-out period of five years. *See* 12 U.S.C. §§ 1464(t)(2)(A), 1464(t)(9)(A), 1464(t)(3)(A). In addition, according to definitions promulgated in regulations issued pursuant to FIRREA, thrifts were no longer allowed to count capital contributions received from the

---

**1.** Under 12 C.F.R. section 563.13 (1986), thrifts were required to keep a certain percentage of their net worth in reserve.

FSLIC towards their capital requirements. *See* 12 C.F.R. § 567.1(w) (1990).

At the time this action was originally filed, Heritage was a federally chartered mutual savings bank. On January 18, 1989, Heritage's board of directors adopted a plan converting Heritage from a mutual savings bank into a federal stock savings bank, and the concurrent formation of a holding company. Subsequently, Heritage Bankcorp, Inc. (the Heritage Holding Company) was incorporated under the laws of the State of Delaware on February 7, 1989, for the purposes of becoming a holding company of Heritage and acquiring, at the effective date of conversion, all capital stock in Heritage.

Heritage completed its conversion to a federal stock savings bank on August 10, 1989. On that day, the Heritage Holding Company issued 2, 139,000 shares of $.01 par value common stock at $10.25 per share. In addition, the Heritage Holding Company purchased one share of Heritage's common stock for $18,424,750.00, becoming the sole shareholder of Heritage.

On July 27, 1993, the Heritage Holding Company, Standard Federal and HFSB Acquisition Corporation, a wholly owned subsidiary of Standard Federal, executed an agreement and plan of reorganization. Under the agreement, HFSB Acquisition Corporation would merge with and into the Heritage Holding Company. The Heritage Holding Company would be the surviving corporation. Subsequently, Heritage Savings Bank would merge with and into Standard Federal. Following the merger between Heritage and Standard Federal, the Heritage Holding Company would be completely liquidated.

The agreement and plan of reorganization specifically addresses the transfer of the claim before the court. Section 5.14 of the agreement and plan of merger states:

*Pending Goodwill Litigation.* Standard agrees to share any amounts recovered, by judgment, settlement or otherwise, in connection with that certain litigation entitled *Heritage Federal Savings Bank vs. United States,* presently pending in the United States Court of Federal Claims (Case No. 92–844C) by paying to the stockholders of the [Holding] Company who are entitled to receive the Merger Consideration, on a pro rata basis in accordance with the number of shares of Company Common Stock outstanding at the Effective Time, 100% of the net amount received by Standard, after taking into account all amounts payable as attorneys fees and expenses (including any fees payable as contingent fees). Standard agrees to continue to prosecute such litigation after the Effective Time, but shall not be obligated to incur more than $25,000 in attorneys' fees plus all reasonable out-of-pocket expenses and costs.

On November 26, 1996, Standard Federal Bancorporation, Inc., the holding company for Standard Federal, and Standard Federal, acting for the former Heritage Holding Company shareholders, executed a modification to the 1993 agreement. The modification stated:

WHEREAS, pursuant to Section 5.14 of the Merger Agreement, Standard agreed to prosecute on behalf of Heritage and the former Heritage shareholders a certain case entitled *Heritage Federal Savings Bank vs. United States,* pending in the United States Court of Federal Claims (Case No. 92–844C) (the "Litigation") and to pay to the former Heritage stockholders 100% of the net amount received by Standard, if the Litigation is successful, after taking into account all expenses relating to the Litigation.

WHEREAS, the cost of prosecuting the Litigation has far exceeded either party's good faith estimates and funds are now needed in excess of $200,000 to prosecute the Litigation.

WHEREAS, the Company [Standard Federal Bancorporation] has agreed to fund such expenses, taking the risk of recovering such expenses based solely upon the successful outcome of the Litigation pursuant to the terms and condition of this Agreement.

Now, therefore, in consideration of the terms and conditions set forth herein, the parties agree as follows:

1. The Company [Standard Federal Bancorporation] agrees to fund all of the reasonable out-of-pocket expenses and

costs of prosecuting the Litigation on behalf of the former Heritage stockholders, which costs are presently anticipated to exceed more than $200,000, including, without limitation, the cost of paying for expert testimony and assistance which costs are estimated at approximately $200,000.

2. In consideration for the Company [Standard Federal Bancorporation] agreeing to fund such costs, Standard [Federal], acting in its capacity as successor to Heritage and on behalf of the former Heritage stockholders, agrees to reimburse the Company for all such costs and expenses paid by the Company after the closing of the Merger Agreement to fund the expenses of the Litigation plus a fee equal to 2% of all sums recovered by the Company, as successor to Heritage and on behalf of the former Heritage stockholders after taking into account all amounts payable as attorneys fees and expenses, including any fees payable as contingent fees and the expenses that the Company has agreed to assume pursuant to this Agreement.

3. The Company [Standard Federal Bancorporation] agrees that its sole source of recovery of the expenses to be funded pursuant to Section 3 of this Agreement and pursuant to Section 5.14 of the Merger Agreement will be recovered solely out of the proceeds of the Litigation.

This Agreement hereby incorporates Section 5.14 of the Merger Agreement except and to the extent amended by this Agreement....

Plaintiff filed its complaint in this court on December 9, 1992. On June 3, 1993, the judge previously assigned this case stayed this and related cases pending the review by the United States Court of Appeals for the Federal Circuit of *Winstar Corp. v. United States*, 21 Cl.Ct. 112 (1990) (finding an implied-in-fact contract, but requesting further briefing on contract issues); 25 Cl.Ct. 541 (1992) (finding contract breached and entering summary judgment on liability); and *Statesman Savings Holding Corp. v. United States*, 26 Cl.Ct. 904 (1992) (granting summary judgment on liability). The trial court had consolidated the two *Winstar* liability

decisions with the *Statesman* liability decision and had certified them for interlocutory appeal. *See Winstar Corp. v. United States*, 979 F.2d 216, 1992 WL 276679 (Fed.Cir.1992) (table) (granting defendant's petition for immediate appeal). A three judge panel of the United States Court of Appeals for the Federal Circuit, with one judge dissenting, reversed the trial court's decision and remanded. *Winstar Corp. v. United States*, 994 F.2d 797 (Fed.Cir.1993). The Court of Appeals for the Federal Circuit, sitting en banc, reversed the panel decision and affirmed the trial court's decision. *Winstar Corp. v. United States*, 64 F.3d 1531 (Fed.Cir.1995). The case was ultimately appealed to the United States Supreme Court, which, in a plurality opinion, affirmed the trial court's decisions finding contract liability on the part of the government. *United States v. Winstar Corp.*, 518 U.S. 839, 910, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

On September 18, 1996, pursuant to an agreement entered into with the parties, then Chief Judge Smith issued the Omnibus Case Management Order setting forth procedures for a short form summary judgment process for *Winstar*-related cases, including the case currently before the court. Under this order, plaintiffs in *Winstar*-related cases were permitted to file motions for summary judgment on two issues: (1) whether there was a *Winstar*-type contract; and (2) whether the government's actions were inconsistent with that contract. Defendant was given time to submit a bifurcated response. Defendant would have sixty days to file a response to the formation and breach issues and 120 days to raise any defenses.

The plaintiff in this case filed its Short Form Motion for Partial Summary Judgment on Liability on February 7, 1997 alleging that the assistance agreement and forbearance letters created a contract between it and the United States and that the government breached the agreement when Congress enacted FIRREA. Defendant filed its response and a cross-motion for partial summary judgment on April 8, 1997, alleging that any contract created between the government and Heritage was not breached by the enactment of FIRREA.

On December 22, 1997, Judge Smith issued a decision in *California Federal Bank v. United States* covering four, consolidated *Winstar*-related cases. 39 Fed.Cl. 753 (1997). The court had consolidated those cases because they presented the greatest number of issues identified by the plaintiffs' coordinating committee as common to more than one *Winstar*-related case. *Id.* at 758. The defendant objected to the procedure. *Id.* The court found for the plaintiffs on all eleven of the common issues it addressed. *Id.* at 779. In addition, the court ordered the defendant, in all *Winstar*-related cases, including the one now before the court, to show cause why the court should not grant the pending short form motions for partial summary judgment on contract liability. *Id.* The defendant responded to the show cause order in this case on February 20, 1998.

On September 14, 1999, defendant filed a Supplemental Motion for Summary Judgment. Defendant's Supplemental Motion for Summary Judgment raised, for the first time, the issue of whether Heritage was the proper plaintiff. On November 5, 1999, plaintiff filed an Opposition to Defendant's Supplemental Motion for Summary Judgment and a Motion to Substitute Standard Federal Bank as the Named Party Plaintiff. On December 3, 1999, defendant filed a reply in support of its Supplemental Motion for Summary Judgment. On December 8, 1999, plaintiff filed a Motion for Leave to File a Surreply and submitted a Surreply in Further Support of its Opposition to Defendant's Motion for Summary Judgment.

Judge Smith issued an order on December 10, 1999. The order read, in its entirety: Good cause having been shown, plaintiff's motion for substitution of Standard Federal Bank as the named plaintiff in this action is granted. Accordingly, the caption of the case shall from this point forward be revised to read: *Standard Federal Bank (formerly known as Heritage Federal Savings Bank) v. United States.*

Subsequently, on December 20, 1999, defendant filed an Opposition to Plaintiff's Motion for Leave to File a Surreply. On February 8, 2000. Judge Smith granted plaintiff's motion for leave to file a surreply and the

surreply was docketed into the record on the same day. The order stated: "Plaintiff's sur-reply does appear to address factual contentions and legal issues newly raised in defendant's reply brief, and the court will permit plaintiff an opportunity to address them."

The case was reassigned from Judge Smith to this judge on December 15, 2000. Following a status conference on January 16, 2001, this court ordered the defendant to file a memorandum addressing issues raised regarding which entity was the proper plaintiff to pursue the instant action and whether the defendant considered all liability issues to have been resolved in previous orders and decisions of the United States Court of Federal Claims in the above captioned case. In addition, the order stated that the court would allow the plaintiff to file an amended complaint to address whether Heritage had failed to plead that FIRREA breached a promise to include the cash contribution in regulatory capital. In its response to the court's order, the defendant stated: "We have determined, based upon the facts in this case and established legal principles, not to contest the existence of a contract or breach. We do not concede that the breach caused any damages or that the named plaintiff in this case is the real party in interest." An amended complaint in this case was filed on January 31, 2001.

## DISCUSSION

The parties have submitted cross-motions for summary judgment on liability pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S.

144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Telemac Cellular Corp. v. Topp Telecom, Inc.,* 247 F.3d 1316, 1323 (Fed.Cir.), *reh'g and reh'g en banc denied* (2001); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir. 1996), *reh'g denied* (1997); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed.Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States,* 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States,* 49 Fed.Cl. 648, 651 (2001); *Becho, Inc. v. United States,* 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.,* 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied, en banc declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States,* 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds,* 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.,* 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly and Co. v. Barr Labs., Inc.,* 251 F.3d 955, 971 (Fed. Cir.), *reh'g and reh'g en banc denied* (2001); *Gen. Elec. Co. v. Nintendo Co.,* 179 F.3d 1350, 1353 (Fed.Cir.1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues, must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communica-*

*tions, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied* (1995)), *reh'g denied, en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines v. United States,* 204 F.3d 1103, 1108 (Fed. Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir. 2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1037 n. 5 (9th Cir.2000), *cert. denied* 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir. 1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Intern., Inc.,* 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir.2001); *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed.Cir.2001). After reviewing the parties' submissions, the court finds that there are no material facts in dispute.

## I. Plaintiff's Short Form Motion for Partial Summary Judgment on Liability

Pursuant to Judge Smith's Omnibus Case Management Order in the *Winstar*-related cases, the plaintiff filed a Short Form Motion for Partial Summary Judgment on Liability on February 7, 1997. In the Short Form Motion for Partial Summary Judgment on Liability, plaintiff argued that the record established plaintiff's "rights to the regulatory capital, accounting treatment of supervisory goodwill and forbearance promises by the government expressed therein." Plaintiff also alleged that the passage of FIRREA and its implementing regulations breached the government's "fundamental contractual commitments to Heritage [now Standard Federal] concerning the regulatory treatment and accounting of the supervisory goodwill acquired in the Family Federal Acquisition."

In its response to plaintiff's Short Form Motion for Partial Summary Judgment on Liability, the government argued that any contract between the government and the plaintiff had not been breached. The defen-

dant made two arguments with regard to the plaintiff's claim that the government was contractually obligated to recognize the capital credits as part of the plaintiff's regulatory capital requirement. First, the government argued that any such promise expired on October 31, 1989, before FIRREA was enacted, pursuant to the termination clause at Section 15 of the assistance agreement between FSLIC and Heritage.[2] Second, the government argued that the assistance agreement "explicitly places the risk of a change of law concerning accounting for the capital credit upon Heritage" because "FSLIC was allowing Heritage to double-count the capital credit *only* to the extent that this was, or remained, within the FSLIC's discretion." (Emphasis in original). According to the defendant, "Heritage accepted the risk that the FHLBB and the FSLIC's discretion to accept non-GAAP [Generally Accepted Accounting Principles] reports concerning the capital credit might be constrained by higher authority." The government also made two arguments with regard to plaintiff's claim that the government agreed to allow plaintiff, over a twenty-five year period, to amortize and count as regulatory capital supervisory goodwill. First, the government argued that, pursuant to Section 15 of the assistance agreement, any such promise expired on October 31, 1989, prior to the enactment of FIRREA. In addition, the government contended that even if the plaintiff was allowed to amortize goodwill over a twenty-five year period, it was not allowed to count that goodwill as regulatory capital over a twenty-five year period.

In the *California Federal Bank v. United States,* 39 Fed.Cl. 753 decision addressing cross-cutting issues in *Winstar*-related cases, Judge Smith rejected arguments similar to those made by the defendant in the instant case. First, Judge Smith rejected the argument that the agreement to allow plaintiff to use the capital credit and supervisory goodwill as regulatory capital was circumscribed by the termination clause in the assistance agreement. *Id.* at 762–63. The court noted that in *Winstar Corp. v. United States,* 64 F.3d 1531, the United States Court of Appeals for the Federal Circuit, sitting en banc, rejected this argument, as follows:

"We view the expiration provisions as only relating to executory provisions set out in the SAA [Supervisory Action Agreement], which obligated the FSLIC to make certain payments to the merged thrift for a limited period of time. This provision of the SAA in any event does not negate other obligations under the merger plan, including the specific time periods for amortization of goodwill."

*Cal. Fed. Bank v. United States,* 39 Fed.Cl. at 762–63 (quoting *Winstar Corp. v. United States,* 64 F.3d at 1542). In addition, Judge Smith noted that in *United States v. Winstar Corp.,* 518 U.S. at 868, 116 S.Ct. 2432, "the Supreme Court could not have affirmed the existence of contracts with respect to amortization of goodwill or the counting of capital credits towards net worth without rejecting Defendant's termination clause arguments." *Cal. Fed. Bank v. United States,* 39 Fed.Cl. at 762–63. Defendant admitted as much in its response to plaintiff's Short Form Motion for Partial Summary Judgment on Liability in this case, when it admitted that it was "determined to re-raise this issue, despite the Federal Circuit's rejection of the termination clause arguments in *Winstar.*"

In addition, the court in *California Federal Bank v. United States* rejected defendant's argument characterizing the government's promise as allowing the thrift to amortize supervisory goodwill on a twenty-five year schedule, but not to actually count goodwill towards regulatory capital for twenty-five years. *Id.* at 766. In this regard, the court noted that the Federal Circuit, when

---

**2.** Section 15(a) of the assistance agreement states:

(a) Except as otherwise specifically provided in this Agreement, this Agreement shall terminate three years following the Effective Date or on such other date to which the parties or their successors agree in writing, *provided* that in the event a receiver is appointed for the purpose of liquidating the RESULTING ASSOCIATION, or the RESULTING ASSOCIATION ceases to be an association the accounts of which are insured by the CORPORATION, this Agreement and all of the CORPORATION's obligations under it shall termination upon the effective date of such occurrence.

construing a similar provision in *Winstar Corp. v. United States*, characterized the agreement as permitting " 'the recording of supervisory goodwill as a capital asset for regulatory purposes to be amortized over [in Winstar's case] 35 years.' " *Id.* (quoting *Winstar Corp. v. United States*, 64 F.3d at 1544). Moreover, the trial court in *California Federal Bank v. United States* found that:

> The Supreme Court undisputedly concluded that "we do not doubt the soundness of the Federal Circuit's finding that the overall 'documentation in the Winstar transaction establishes an express agreement allowing Winstar to proceed with the merger plan approved by the Bank Board, including the recording of supervisory goodwill as a capital asset for regulatory capital purposes to be amortized over 35 years.' "

*Id.* (quoting *United States v. Winstar Corp.*, 518 U.S. at 865–66, 116 S.Ct. 2432 (quoting *Winstar Corp. v. United States*, 64 F.3d at 1544)).

Finally, the court in *California Federal Bank v. United States*, 39 Fed.Cl. at 776–78 rejected the government's argument that the thrifts bore the risk of a change in law or regulation, relying on Justice Antonin Scalia's concurrence in *United States v. Winstar Corp.*, which stated:

> If, as the dissent believes, the Government committed only "to provide [certain] treatment unless and until there is subsequent action" [*United States v. Winstar Corp.* 518 U.S. at 935, 116 S.Ct. 2432] then the Government in effect said "we promise to regulate in this fashion for as long as we chose to regulate in this fashion"—which is an absolutely classic description of an illusory promise.

*United States v. Winstar Corp.*, 518 U.S. at 921, 116 S.Ct. 2432 (Scalia, J., concurring). After rejecting the government's positions on the cross-cutting issues, Judge Smith issued a show cause order in all *Winstar*-related cases, as discussed above.

In the case currently before the court, the defendant filed a response to the show cause order contesting the process which had led up to the trial court's decision in *California Federal Bank v. United States*, and the order to show cause issued by Judge Smith, on February 20, 1998.[3] In its response to the show cause order in the instant case, the defendant conceded, however, that:

> Given the breadth of this opinion [*California Federal Bank v. United States*, 39 Fed.Cl. 753] we can offer no additional reason (other than failure to plead properly)[4] why, if our interpretation of the Court's ruling is correct, that the Court should not hold that a contract regarding the use of goodwill to satisfy the Government's minimum capital requirements exists in this case.

Seven months later, however, while the instant case was still before Judge Smith, defendant filed its Supplemental Motion for Summary Judgment contesting that plaintiff was not entitled to summary judgment because Heritage was not the proper plaintiff.

Shortly after the case was transferred to the undersigned judge on December 15, 2000, the court held a status conference. Following the status conference, on January 16, 2001, the court ordered the defendant to file a memorandum with the court:

> describing the government's position as to the impact of previous opinions and orders, entered by the United States Court of Federal Claims in this and other *Winstar*-related cases on the liability issues in the

---

3. In *California Federal Bank v. United States*, 245 F.3d 1342 (Fed.Cir.2001), *cert. denied* —— U.S. ——, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002), the Court of Appeals for the Federal Circuit affirmed the liability decision of the trial court with respect to the specific bank plaintiff in *California Federal Bank v. United States*, 39 Fed.Cl. at 758–59, only, but by doing so impliedly blessed the procedure which identified issues common to a number of *Winstar*-related cases and created precedent on those issues decided by the Circuit Court in *California Federal Bank v. United States*.

4. The defendant alleged that "Heritage failed to plead in its complaint that FIRREA breached a promise to include the cash contribution in regulatory capital." This issue was resolved by the court's order of January 16, 2002 allowing plaintiff to file an amended complaint. Plaintiff filed its amended complaint on January 31, 2001. Defendant has not responded to the amended complaint.

above captioned assisted transaction case. The defendant also shall indicate whether, not including the issue raised by the defendant regarding the real party in interest, the defendant considers all liability issues to have been resolved in previous orders and decisions of the United States Court of Federal Claims.

The defendant filed its memorandum in response on February 2, 2001. In this memorandum, the defendant argued that the court was not bound by prior decisions of the United States Court of Federal Claims or the concession made by the defendant following the show cause order. Moreover, defendant argued that "this Court is free to consider liability *de novo*." Nevertheless, the defendant stated:

> Notwithstanding the foregoing explanation, which we respectfully submit in an effort to clarify for the Court both the nature of the prior procedures and our position with respect to those procedures, we have determined not to contest the existence of a contract and its breach in this case. We continue to dispute that the breach caused any damages and that the named plaintiffs are the real party in interest. We believe that certain liability arguments could be raised in this case (*e.g.,* that the approval of the use of purchase method accounting was not a promise to allow goodwill to be counted as regulatory capital, and that the approval of an amortization period of 25 years does not create a 25–year term of the contract.) However, the case can be more easily and efficiently resolved upon other grounds.

Thus, the only issue preventing the court from granting plaintiff's Short Form Motion for Partial Summary Judgment on Liability is whether Standard Federal is the proper party to bring suit.

## II. Defendant's Supplemental Motion for Summary Judgment

Although defendant does not contest that there was a contract between Heritage and the government and that the government breached that contract, defendant raises an additional defense to liability. Defendant argues that it should prevail in the lawsuit because pursuant to Rule 17(a) of the RCFC, the former Heritage Holding Company shareholders, not Standard Federal, are the potential recipients of recovery, and that they lack individual standing to prosecute this suit because the real party in interest, Heritage, no longer exists. In subsequent briefings, defendant has proposed a slightly different argument, alleging that the former Heritage Holding Company shareholders are the real party in interest, but that they lack standing to prosecute this suit.

Plaintiff argues that following the merger between Standard Federal and Heritage, Standard Federal became the real party in interest by operation of law. According to plaintiff, Rule 25(c) of the RCFC allows the court to substitute Standard Federal for Heritage in such a situation. Moreover, plaintiff argues that all that should occur is a change in the caption name, with no other substantive effect or difference. Finally, plaintiff believes that Judge Smith's December 10, 1999 order substituting Standard Federal for Heritage resolved the issue, despite the fact that Judge Smith granted an opportunity to file a surreply on February 8, 2000, after the issuance of the December 10, 1999 order.

On its face, Judge Smith's December 10, 1999 order addresses the issues now before the court. Judge Smith's order grants plaintiff's motion for substitution of Standard Federal as the named plaintiff in the caption. The brief December 10, 1999 order, however, simply grants plaintiff's request to substitute for "[g]ood cause having been shown." The order does not substantively address the issues raised in defendant's Supplemental Motion for Summary Judgment, filed on November 5, 1999. In addition, on February 8, 2000, two months after the December 10, 1999 order was entered, Judge Smith allowed an additional filing on the motion to substitute Standard Federal, suggesting that the court still considered the issue open. Therefore, given the inconsistencies mentioned above and mindful of the long and contentious history of *Winstar*-related litigation, the court believes that it is appropriate to consider and address the issue in a written decision discussing the specific arguments on

the government's final remaining asserted defense on liability raised by the parties in papers filed before and after the December 10, 1999 order issued by Judge Smith.

■ Initially, a determination must be made of whether to apply Rule 17(a) or Rule 25(c) of the RCFC. In pertinent part, RCFC 17(a) is identical to Rule 17(a) of the Federal Rules of Civil Procedure.[5] Both rules state: "Real Party in Interest. Every action shall be prosecuted in the name of the real party in interest." RCFC 17(a); Fed.R.Civ.P. 17(a). The rule operates when an interest is transferred prior to the start of litigation. *See Hilbrands v. Far E. Trading Co.*, 509 F.2d 1321, 1323 (9th Cir.1975); *Veverica v. Drill Barge Buccaneer No. 7*, 488 F.2d 880, 886–87 (5th Cir.1974); 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1958, at 553 (2d ed.1986). When a claim is not brought by the real party in interest, the rule allows for dismissal of the claim only after a reasonable time has been allowed following an objection for "ratification of commencement of the action by, or joinder or substitution of, the real party in interest ...." RCFC 17(a). " 'The 'real party in interest' is the party who, by substantive law, possesses the right sought to be enforced and not necessarily the person who will ultimately benefit from the recovery.' " *United States v. 936.71 Acres of Land*, 418 F.2d 551, 556 (5th Cir.1969) (quoting Barron and Holtzoff, *Federal Practice and Procedure*, § 482 (Wright ed.1961)); accord *Gen. Dynamics Corp. v. United States*, 47 Fed.Cl. 514, 531–32 (2000) (citing 4 *Moore's Federal Practice*, § 17.101 (3d ed.) and *Cinema N. Corp. v. Plaza at Latham Assocs.*, 867 F.2d 135, 139 (2d Cir.1989)).

Rule 25(c) of the RCFC states: "Transfer of Interest. In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party." RCFC 25(c) is identical to Fed.R.Civ.P. 25(c). The rule operates when an interest is transferred during pending litigation. *See Horphag Research Ltd. v. Consac Indus., Inc.*, 116 F.3d 1450, 1453 (Fed.Cir.1997) (stating that Rule 25(c) applies to pending litigation); *Hilbrands v. Far E. Trading Co.*, 509 F.2d at 1323, 7C, Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1958, at 553; *see also Veverica v. Drill Barge Buccaneer No. 7*, 488 F.2d at 886–88. "Rule 25(c) 'does not require that anything be done after an interest has been transferred.' " *Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 71 (3d Cir.1993). If the interest is transferred during the litigation, the rule allows for the action to "be continued by or against the original party." RCFC 25(c). The court may substitute or join the party to whom the interest has been transferred. RCFC 25(c). "Because joinder or substitution under Rule 25(c) does not ordinarily alter the substantive rights of parties but is merely a procedural device designed to facilitate the conduct of a case, a Rule 25(c) decision is generally within the [trial] court's discretion." *Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d at 71–72.

When a court is asked to substitute a party under Rule 25(c), the court proceeds to determine which entity is the successor in interest to the original plaintiff. *See* RCFC 25(c) (stating that the court may substitute "the person to whom the interest is transferred"); *Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d at 73; *Panther Pumps & Equip. Co. v. Hydrocraft, Inc.*, 566 F.2d 8, 22 (7th Cir.1977), *cert. denied sub nom. Beck v. Morrison Pump Co.*, 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978). Rule 25(c) "does not substantively determine what actions survive the transfer of interest;

---

**5.** In general, the Rules of the United States Court of Federal Claims (RCFC) are closely patterned upon the Federal Rules of Civil Procedure (Fed. R.Civ.P.). *Te–Moak Bands of W. Shoshone Indians v. United States*, 948 F.2d 1258, 1260 n. 4 (Fed.Cir.1991). Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court. *Bank of Amer., FSB v. United States*, 51 Fed.Cl. 500, 513 n. 6 (2002); *Hickman v. United States*, 43 Fed.Cl. 424, 439 (1999); *see, e.g., Jay v. Sec'y DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

rather, it provides substitution procedures for an action that does survive." *ELCA Enters., Inc. v. Sisco Equip. Rental & Sales, Inc.*, 53 F.3d 186, 191 (8th Cir.1995) (citing *Hilbrands v. Far E. Trading Co.*, 509 F.2d at 1323). To determine whether the right survives the transfer, the courts examine substantive law. *See id.; Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d at 73 (citing 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1952, at 528).

The analysis required under Rule 25(c) to determine the successor in interest to the original plaintiff is similar to the analysis involved in determining the real party in interest for Rule 17(a) purposes. Both analyses look to substantive state or federal law, rather than a rule specific standard, to determine whether a party is a real party in interest under Rule 17(a), or a successor in interest under Rule 25(c). Heritage filed the complaint in this case on December 9, 1992. The merger between Heritage and Standard Federal in which the interest in this claim was transferred, occurred on July 27, 1993. Because the transfer occurred while the litigation was pending, Rule 25(c) is controlling.

■ Generally, courts have found that, "[a] 'transfer of interest' in a corporate context occurs when one corporation becomes the successor to another by merger or other acquisition of the interest the original corporate party had in the lawsuit." *Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d at 71 (citing *Froning's, Inc. v. Johnston Feed Serv. Inc.*, 568 F.2d 108, 110 (8th Cir. 1978); *DeVilliers v. Atlas Corp.*, 360 F.2d 292, 297 (10th Cir.1966); *Hazeltine Corp. v. Kirkpatrick*, 165 F.2d 683, 685–86 (3d Cir.), *cert. denied* 334 U.S. 819, 68 S.Ct. 1084, 92 L.Ed. 1749 (1948)). Federal statute and regulations address the treatment due to the assets of a federal savings stock association upon merger with another federal savings association. At the pertinent time, pursuant to 12 U.S.C. § 1464(d)(3)(a) (1988 & Supp. V 1993), the Director of the Office of Thrift Supervision had the authority to promulgate regulations for the merger of two federal savings associations. The Director promulgated the regulations at 12 C.F.R. part 552,

which apply to the incorporation, organization, and conversion of federal stock associations. The regulations at 12 C.F.R. section 552.13(k)(1), governing combinations involving federal stock associations, state:

> Mergers and consolidations: transfer of assets and liabilities to resulting association. Upon the effective date of merger or consolidation under this section, if the resulting association is a Federal savings association, all assets and property (real, personal, and mixed, tangible and intangible, choses in action, rights, and credits) then owned by each constituent association or which would inure to any of them, shall immediately by operation of law and without any conveyance, transfer, or further action, become the property of the resulting association. The resulting association shall be deemed to be a continuation of the entity of each constituent association, the rights and obligations of which shall succeed to such rights and obligations and the duties and liabilities connected therewith.

Combinations Involving Federal Stock Associations, 12 C.F.R. § 552 .13(k)(1) (1992). At the time of the merger, Heritage was a federally chartered stock savings bank and Standard Federal was a federal savings bank. Following the merger, Standard Federal continued as a federal savings bank. Therefore, 12 C.F.R. section 552.13(k)(1) is applicable. Because the regulation provides that all "chooses in action" owned by the constituent association will be transferred, by operation of law, to the resulting association, the claim at issue in the instant case was transferred from Heritage to Standard Federal in the merger.

Consistent with this regulation, a variety of courts have concluded that following a merger, the surviving corporation stands in the shoes of the dissolving corporation. *See, e.g., In re Lafayette Radio Elecs. Corp.*, 761 F.2d 84, 92 (2d Cir.1985); *Anspec Co., v. Johnson Controls, Inc.*, 922 F.2d 1240, 1244– 45 (6th Cir.1991). Indeed, 12 C.F.R. section 552.13(k)(1) describes a complete transfer, by operation of law, of all rights, obligations, assets and property when a federal stock savings bank merges with another federal savings association. The resulting federal

savings association is considered a continuation of the entity of the constituent association. 12 C.F.R. § 552.13(k)(1). Moreover, in the case of a merger between two federal savings associations, the government has notice of the transfer of assets because it must approve of the merger in writing. *See* 12 C.F.R. § 552.13(d).

However, notwithstanding the impact of 12 C.F.R. section 552.13(k)(1), providing for the transfer of claims during a merger, defendant argues that the interest in the claim before the court was transferred to the former Heritage Holding Company shareholders.[6] Defendant bases its argument on allegations that the former Heritage Holding Company shareholders have an attorney-client relationship with the counsel of record for the plaintiff and that, pursuant to section 5.14 of the agreement and plan of reorganization between Standard Federal and the Heritage Holding Company, the former Heritage Holding Company shareholders will receive one hundred percent [7] of any recovery in this litigation and are responsible for all attorneys fees. To support its allegations, the government cites the deposition of Standard Federal's executive vice president and secretary, Ronald Palmer. According to Mr. Palmer's deposition, Ed Lublin, counsel of record for the plaintiff, negotiated the modification executed on November 26, 1996 for the former Heritage Holding Company shareholders. As the modification states, however, the former Heritage Holding Company shareholders were represented by Standard Federal, as Heritage's successor in interest. Therefore, to the extent that Mr. Lublin did negotiate the modification for the former Heritage Holding Company shareholders, he did so while representing Standard Federal. Furthermore, in plaintiff's surreply in support of its opposition to defendant's Supplemental Motion for Summary

Judgment, signed by Mr. Lublin as the attorney of record, plaintiff's counsel has stated that: "[c]ounsel of record did not represent Heritage's former shareholders in the modification or at any other time." To the extent that there is any doubt between the conflicting statements by Mr. Palmer and Mr. Lublin, such doubt must be resolved in favor of the party opposing summary judgment, here the plaintiff, to whom the benefit of all presumptions and inferences runs. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Wanlass v. Fedders Corp.,* 145 F.3d at 1463; *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d at 163 (Fed.Cir.1985).

Moreover, even if Mr. Lublin did have an attorney-client relationship with the former Heritage Holding Company shareholders, the court fails to see how that fact is relevant in determining which entity is the successor in interest to Heritage's claim. Nor has defendant provided any rationale as to why this fact is probative. The portion of defendant's brief devoted to this topic makes the argument that there was an attorney-client relationship between Mr. Lublin and the former Heritage Holding Company shareholders, then simply concludes that this fact is probative.

To the extent that defendant argues that Section 5.14 of the agreement and plan of reorganization between Standard Federal and Heritage transferred the claim to the former Heritage Holding Company shareholders, the government must show that the owner of the claim manifested " 'an intention to make the assignee the owner of [the] claim.' " *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* 106 F.3d 11, 17 (2d Cir.1997) (quoting *Titus v. Wallick,* 306 U.S. 282, 288–89, 59 S.Ct. 557, 83 L.Ed. 653 (1939)); *United States v. Central Gulf Lines,*

---

6. The court notes that in their arguments both defendant and plaintiff use the term "real party in interest." That term is considered in a Rule 17(a) analysis. The analysis pertinent to this case involves Rule 25(c), regarding which the case law generally addresses whether or not an entity is the "successor in interest" to the original entity.

7. In fact, following the November 1996 modification to the agreement and plan of merger between Standard Federal and Heritage, the former Heritage Holding Company shareholders' interest was reduced to 98% of recovery and Standard Federal was to receive "2% of all sums received by the Company as successor to Heritage and on behalf of the former Heritage Stockholders," after reduction for attorneys fees and expenses.

*Inc.,* 974 F.2d 621, 630 (5th Cir.1992) (citing Restatement (Second) of Contracts § 324, at 37 (1981) and 4 Arthur L. Corbin, *Corbin on Contracts,* § 879, at 528 (1951 & Supp.1991)), *cert. denied* 507 U.S. 917, 113 S.Ct. 1274, 122 L.Ed.2d 669 (1993). In this regard, defendant attempts to show that the claim was transferred to the former Heritage Holding Company shareholders because the agreement and plan of reorganization required Standard to share 100% of any proceeds from the litigation with the former Heritage Holding Company shareholders. An assignment of the proceeds from a claim, however, is not an assignment of the claim itself. *See Produce Factors Corp. v. United States,* 199 Ct.Cl. 572, 580–81, 467 F.2d 1343, 1347–48 (1972) (holding that the assignee of proceeds under a government contract could not bring breach of contract action and noting that the rights of an assignee of proceeds are " 'limited to its right to receive money under the contract.' " (quoting *Wyo. Nat'l Bank v. United States,* 292 F.2d 511, 514, 154 Ct.Cl. 590, 594–95 (1961))); *see also Advanced Magnetics, Inc. v. Bayfront Partners, Inc.,* 106 F.3d at 17 (noting that the validity of an assignment is "not affected by the parties' additional agreement that the transferee will be obligated to account for the proceeds of a suit brought on the claim"); *United States v. 936.71 Acres of Land,* 418 F.2d at 556 ("[T]he 'real party in interest' is the party who, by substantive law, possesses the right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery."). Therefore, that the former Heritage Holding Company shareholders stand to receive 100% (or 98% under the modification) of any proceeds from this litigation does not necessarily give them an interest in the underlying claim.

With regard to defendant's argument concerning responsibility for attorney's fees, defendant cites *Unification Church v. I.N.S.,* 762 F.2d 1077 (D.C.Cir.1985) in support of its argument concerning both the assignment of proceeds and attorneys fees. The defendant argues that like in *Unification Church,* the entity having responsibility for fees or designated as the recipient of proceeds, here the former Heritage Holding Company shareholders, is the successor in interest to the

claim at issue. *Unification Church v. I.N.S.,* which is not binding on this court, also is distinguishable because it applied the real party in interest doctrine only within the context of Equal Access to Justice Act (EAJA) attorneys fees, Pub.L. No. 96–481, tit. II, 94 Stat. 2325 (1980) (codified at 5 U.S.C. § 504 and 28 U.S.C. § 2412), and not in a case determining the merits of a liability claim. In *Unification Church v. I.N.S.,* three individuals and the Unification Church prevailed over the I.N.S. in litigation. *Unification Church v. I.N.S.,* 762 F.2d at 1079. The three individual plaintiffs sought attorneys fees from the government through EAJA, even though plaintiffs' counsel was to be paid entirely by the Church. *Id.* at 1082. The United States Court of Appeals for the District of Columbia Circuit wrote: "After the District Court examined the fee arrangement between the individual appellants and the Church, however, it held that that arrangement made the Church the only 'real party in interest' *with respect to fees,* and thus made irrelevant the qualification *vel non* of individual plaintiffs for fees." *Id.* at 1081 (emphasis added). The court found that the three individual plaintiffs were not entitled to attorneys fees because "[t]he Church is the beneficiary of any award of fees, not the individual appellants, and thus the Church can fairly be characterized as the real party in interest." *Id.* at 1082. As is discussed above, the determination of the real party in interest or successor in interest is determined by the applicable substantive law. *See ELCA Enterps., Inc. v. Sisco Equip. Rental & Sales, Inc.,* 53 F.3d at 191; *Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.,* 13 F.3d at 73 (citing 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1952, at 528); *United States v. 936.71 Acres of Land,* 418 F.2d at 556; *Gen. Dynamics Corp. v. United States,* 47 Fed.Cl. at 531–32. The court in *Unification Church v. I.N.S.* examined the real party in interest doctrine to understand congressional intent with regard to a specific section of the EAJA. 762 F.2d at 1082; *see also Wall Indus., Inc. v. United States,* 15 Cl.Ct. 796, 803 (1988) (stating that *Unification Church v. I.N.S.* used the term "real party in interest" "within the context of the EAJA to mean

the sole beneficiary of an award of fees"). In *National Association of Manufacturers v. Department of Labor,* 159 F.3d 597, 602 (D.C.Cir.1998), the Court of Appeals for the District of Columbia Circuit clarified the scope of *Unification Church v. I.N.S.,* stating that "in *Unification Church,* we were trying to determine the "real party in interest" *with respect to fees,' not with respect to the merits of the underlying litigation. [Unification Church v. I.N.S.,* 762 F.2d] at 1081 (emphasis added)." *Nat'l Assoc. of Manufacturers v. Dep't of Labor,* 159 F.3d at 603. Because *Unification Church v. I.N.S.* applied the real party in interest doctrine to the determination of a claim under the EAJA statute, with its specific purpose and unique interpretive developing case precedent, it does not resolve the issues in the instant case, which involve interpreting corporate and contract law in the context of litigation of the merits of the claim.

Finally, defendant's argument that Section 5.14 of the agreement and plan of reorganization between Heritage and Standard Federal assigned the claim to the former Heritage Holding Company shareholders runs counter to accepted rules of contract interpretation. The primary objective in contract interpretation is to discern the parties' intent at the time the contract was executed. *King v. Dep't of the Navy,* 130 F.3d 1031, 1033 (Fed.Cir.1997); *Winstar Corp. v. United States,* 64 F.3d 1531, 1540 (Fed.Cir. 1995) (citing *Arizona v. United States,* 216 Ct.Cl. 221, 234, 575 F.2d 855, 863, (1978)), *aff'd on other grounds,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The language of the "contract must be given that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances." *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 388, 351 F.2d 972, 975 (1965); *accord Metric Constructors, Inc. v. NASA,* 169 F.3d 747, 752 (Fed.Cir.1999). Moreover, words are to be given their plain and ordinary meanings unless the parties have agreed to an alternative definition. *Jowett, Inc. v. United States,* 234 F.3d 1365, 1368 (Fed.Cir.2000); *Giove v. Dep't of Transp.,* 230 F.3d 1333, 1340 (Fed.Cir.2000); *Thanet Corp. v. United States,* 219 Ct.Cl. 75,

82, 591 F.2d 629, 633 (1979). In addition, a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *See Jowett, Inc. v. United States,* 234 F.3d at 1368; *Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1305 (Fed. Cir.), *reh'g denied, en banc suggestion declined* (1996); *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1434 (Fed.Cir.), *reh'g denied* (1996); *Fortec Const. v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985) (citing *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir.1983)). To ascertain the intentions of the parties, the contract should be construed in its entirety "so as to harmonize and give meaning to all its provisions." *Thanet Corp. v. United States,* 219 Ct.Cl. at 82, 591 F.2d at 633 (citing *ITT Arctic Servs., Inc. v. United States,* 207 Ct.Cl. 743, 751–52, 524 F.2d 680, 684 (1975); *Northwest Marine Iron Works v. United States,* 203 Ct.Cl. 629, 637, 493 F.2d 652, 657 (1974)); *accord Jowett, Inc. v. United States,* 234 F.3d at 1368; *Giove v. Dep't of Transp.,* 230 F.3d at 1340.

Section 5.14 of the agreement and plan of reorganization between Standard Federal and Heritage states:

Pending Goodwill Litigation. Standard agrees to share any amounts recovered, by judgment, settlement or otherwise, in connection with that certain litigation entitled *Heritage Federal Savings Bank vs. United States,* presently pending in the United States Court of Federal Claims (Case No. 92–844C) by paying to the stockholders of the [Holding] Company who are entitled to receive the Merger Consideration, on a pro rata basis in accordance with the number of shares of Company Common Stock outstanding at the Effective Time, 100% of the net amount received by Standard, after taking into account all amounts payable as attorneys fees and expenses (including any fees payable as contingent fees). Standard agrees to continue to prosecute such litigation after the Effective Time, but shall not be obligated to incur more than $25,000 in attorneys' fees plus all reasonable out-of-pocket expenses and costs.

First, Standard Federal promised to "share any amounts recovered, by judgement, settlement or otherwise, in connection with" the litigation. If, as defendant argues, the former Heritage Holding Company shareholders received the claim in the merger, there would be no need for Standard Federal to "share" the proceeds. As the owner of the claim, the former Heritage Holding Company shareholders would receive the proceeds directly. Second, Standard Federal promised to continue to prosecute the claim. If the court were to accept defendant's argument that the former Heritage Holding Company shareholders held the claim, it would be unnecessary for Standard Federal to agree to "continue to prosecute" the claim. The former Heritage Holding Company shareholders could prosecute the claim themselves. The words of Section 5.14 of the agreement and plan of reorganization do not support defendant's argument.

To the extent that the merger agreement is ambiguous, the modification also provides evidence that during the course of performance of the merger agreement between Standard Federal and Heritage, the parties interpreted the merger agreement as transferring the interest in the instant action to Standard Federal. " 'It is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation.' " *Saul Subsidiary II Ltd. P'ship v. Barram*, 189 F.3d 1324, 1326 (Fed.Cir.1999) (quoting *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 558 (Fed.Cir.1982)). The modification states that Standard Federal was "acting in its capacity as successor to Heritage" with regard to the lawsuit at issue. Thus, at the time the modification was executed, November 26, 1996, both Standard Federal and the former Heritage Holding Company shareholders understood that Standard Federal was the successor in interest to Heritage and that the interest in the instant lawsuit had transferred to Standard Federal as part of the merger.

## CONCLUSION

Based on the above discussion, Standard Federal is the successor in interest to Heri-

tage with regard to the claim at issue in the instant case by operation of law and none of defendant's arguments defeat that result. Under Rule 25(c) of the RCFC, Standard Federal Bank may be substituted in the caption as the party to pursue the litigation at issue. The court **DENIES** defendant's Supplemental Motion for Summary Judgment. In addition, as defendant has stated that it has determined "not to contest the existence of a contract or breach" the court **GRANTS** plaintiff's motion for partial summary judgment on contract liability and **DENIES** defendant's cross-motion for partial summary judgment on contract liability.

**IT IS SO ORDERED.**